4 F.3d 1071
 RICO Bus.Disp.Guide 8380
 Ismail ABOU-KHADRA; Contractors Services Establishment;
and Saudi Preinsulated Pipes Industries,
Plaintiffs-Appellants-Cross-Appellees,
v.
George T. MAHSHIE, Defendant,
Abdallah G. Bseirani; AGB International Management
Corporation; and Pittcon Preinsulated Pipes
Corporation,
Defendants-Appellees-Cross-Appellants.
Abdallah G. BSEIRANI; AGB International Management
Corporation; and Pittcon Preinsulated Pipes
Corporation, Plaintiffs-Appellees-Cross-Appellants,
v.
Wasfieh ABOU-KHADRA, Defendant,
George T. Mahshie and Tony Deeb,
Defendants-Appellants-Cross-Appellees.
 Nos. 1023, 1024, 1025, 1131, Dockets 91-7961, 91-9153,
91-9193, 91-9195.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 28, 1992.
Decided Sept. 9, 1993.
As Amended Nov. 29, 1993.
 
 Arthur W. Rovine, Baker & McKenzie, New York City, for Ismail Abou-Khadra, Contractors Services Establishment, Saudi Preinsulated Pipes Industries and Tony Deeb.
 James D. Lantier, Smith, Sovick, Kendrick, Schwarzer & Sugnet, P.C., Syracuse, NY, for George Mahshie.
 David E. Peebles, Syracuse, NY (Martha L. Berry, Hancock & Estabrook, Syracuse, NY, of counsel), for Abdallah G. Bseirani, AGB Intern. Management Corp. and Pittcon Preinsulated Pipes Corp.
 Before: LUMBARD, NEWMAN and WINTER, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 Ismail Abou-Khadra, Contractors Services Establishment ("CSE"), Saudi Preinsulated Pipes Industries ("SPPI"), Tony Deeb and George Mahshie appeal from judgments of several million dollars entered against them.[1] Their appeals raise a tangle of issues complicated by the fact that they chose not to raise many of them in the district court. We affirm the findings of liability as to Abou-Khadra, CSE and SPPI, but we vacate the judgment entered against them and remand to the district court to modify that judgment. Because there was insufficient evidence of Deeb's connection to any wrongdoing, we reverse the judgment against him. Finally, because a number of errors prejudicial to Mahshie were made during the trial, we reverse the judgment against him and remand to the district court for proceedings consistent with this opinion.
 
 BACKGROUND
 A. The Parties
 
 2
 Appellant Ismail Abou-Khadra is a citizen and resident of Saudi Arabia. In 1975, Abou-Khadra established appellant CSE, a Saudi Arabian entity engaged in the sale of building supplies.
 
 
 3
 Appellee Abdallah G. Bseirani was born in Syria and educated in Lebanon and the United States. He is now an American citizen. After working for a number of years for Carrier International Corporation's Middle Eastern and East African operations, Bseirani resigned in 1976 to begin his own company. He formed appellee AGB International Management Corporation ("AGBI"), a New York corporation that represents the interests of American manufacturers of heating, ventilation and air-conditioning equipment in the Middle East.
 
 
 4
 Appellant George T. Mahshie is an attorney practicing in Syracuse, New York, who, prior to the events giving rise to this action, had been associated with both Abou-Khadra and Bseirani.
 
 
 5
 Appellant SPPI is a Saudi Arabian sole proprietorship owned by Abou-Khadra, which is licensed by the Saudi Ministry of Industry to produce preinsulated pipe--pipe designed to transport gases and liquids at a constant temperature--at a manufacturing facility located in Saudi Arabia.
 
 
 6
 Appellee Pittcon Preinsulated Pipes Corporation ("Pittcon") is a New York corporation formed by Bseirani, who is the president and sole shareholder. Pittcon currently holds a process patent for the manufacture of preinsulated pipe and trademark for its name as applied to that pipe. Bseirani had purchased this trademark and patent in 1981 from Pittcon Systems Company.
 
 
 7
 Appellant Tony Deeb is a Lebanese citizen who was hired by Bseirani in 1981 to assist in Bseirani's and Abou-Khadra's Saudi Arabian operations.
 
 B. The CSE Arrangement
 
 8
 In the late 1970s, Bseirani became interested in selling heating, ventilation and air-conditioning equipment in Saudi Arabia. However, Saudi law prohibits a non-Saudi entity from importing products for sale in Saudi Arabia unless sponsored by a Saudi entity. In November 1978, Mahshie told Bseirani that Abou-Khadra might be interested in assisting Bseirani in setting up an import operation in Saudi Arabia.
 
 
 9
 Bseirani and Abou-Khadra engaged in a series of negotiations in Syracuse and Riyadh, Saudi Arabia. It is undisputed that, as a result of these negotiations, Abou-Khadra agreed to allow Bseirani to import heating, ventilation and air-conditioning equipment to sell in Saudi Arabia under the auspices of the then-dormant CSE and that Bseirani agreed to pay CSE's expenses and to guarantee CSE's debt or other liability. It is also undisputed that Bseirani agreed to pay Abou-Khadra a monthly fee. However, Abou-Khadra claimed that Bseirani agreed to pay him twelve percent of the gross sales of CSE, while Bseirani testified that he had agreed to pay Abou-Khadra twelve percent only of gross profits.
 
 
 10
 According to Bseirani, the terms of this agreement were reduced to writing in March 1979, with the assistance of Mahshie. Bseirani testified that on March 16, 1979, he signed a letter detailing the terms, and gave the letter to Mahshie, who purportedly assured Bseirani that Abou-Khadra received a copy. Mahshie allegedly told Bseirani that although the letter had not been signed by Abou-Khadra, it was binding upon him. Abou-Khadra, however, testified that he neither saw this letter nor consented to the provision for payment of twelve percent of CSE's gross profits rather than twelve percent of gross sales.
 
 
 11
 Bseirani thereafter imported and sold heating, ventilation and air-conditioning equipment through CSE and, pursuant to the agreement, made periodic accountings and payments of amounts that he believed were owed to Abou-Khadra. In December 1983, Abou-Khadra allegedly confiscated the company from Bseirani. See Sec. D, infra.
 
 C. The SPPI Arrangement
 
 12
 During 1979, Bseirani discussed with Abou-Khadra the possibility of cooperation in opening a facility in Saudi Arabia to manufacture preinsulated pipe. Thereafter, Abou-Khadra founded SPPI as a sole proprietorship under Saudi law, and in 1980 applied on behalf of SPPI to the Saudi Ministry of Industry for a license to build a preinsulated pipe facility. In May 1981 the Ministry of Industry approved the application. At about the same time, and in preparation for the Saudi preinsulated-pipe operation, Bseirani established Pittcon, to which he transferred the recently purchased patent and trademark rights to the preinsulated pipe known as "Pittcon."
 
 
 13
 Bseirani testified that in September 1981, he sent Deeb to Saudi Arabia to continue negotiations with Abou-Khadra, specifically with regard to the capitalization of SPPI and the respective contributions of Bseirani and Abou-Khadra towards the needed capital. A series of meetings in Syracuse between Bseirani and Abou-Khadra followed. According to Bseirani, it was agreed that SPPI's initial capitalization would be $1 million and that Bseirani and Abou-Khadra would each hold a forty-nine percent equity interest in the company, with Mahshie holding the remaining two percent. This agreement was never reduced to writing, and Mahshie denied any such ownership interest.
 
 
 14
 In January 1982, Deeb again journeyed to Saudi Arabia. In connection with this trip, Bseirani instructed Deeb to obtain a $500,000 check from Bseirani's bank in Zurich and to give the check to Abou-Khadra. Bseirani testified that the $500,000 was to be his cash contribution to the capitalization of SPPI. Bseirani also testified that he asked Deeb to obtain a receipt from Abou-Khadra evidencing delivery of the check as Bseirani's capital contribution to SPPI. Deeb, however, never obtained such a receipt and at trial denied that Bseirani had asked for one. The $500,000 check was deposited into SPPI's account on February 16, 1982. The financial records of SPPI describe this deposit as "owner's equity." In March 1982, Abou-Khadra deposited approximately $500,000 of his funds into SPPI's account, also recorded as "owner's equity."
 
 
 15
 Bseirani became concerned that his equity interest in SPPI, which under Saudi law was a sole proprietorship owned by Abou-Khadra, had never been formalized. Thus, during Deeb's second trip to Saudi Arabia, Deeb met with a Saudi attorney, Antoine Abawatt, on Bseirani's behalf regarding the means by which Bseirani, a non-Saudi, might protect his interest in SPPI. Abawatt then prepared a report for Bseirani, outlining steps Bseirani might take to formalize his interest in SPPI. Deeb forwarded this report to Bseirani.
 
 
 16
 In March 1982, Deeb, who had discussed the matter with both Abawatt and Abou-Khadra, advised Bseirani that it was preferable to postpone formalization of Bseirani's interest. Deeb sent Bseirani the documents upon which this recommendation was based. Accordingly, Bseirani, who testified that he had discussed the matter with Abou-Khadra as well, agreed to put off formalizing his equity interest in SPPI.
 
 
 17
 In an attempt to facilitate approval of a loan from the Saudi Industrial Development Fund, SPPI and Pittcon entered into a license agreement on January 4, 1982. This agreement granted SPPI a license to use the Pittcon trademark and the patented process for producing Pittcon preinsulated pipe in Saudi Arabia. The license demonstrated to the Saudi Industrial Development Fund that SPPI was technically capable of manufacturing preinsulated pipe. A second license agreement, dated September 29, 1982, superseded the January agreement and was in turn superseded by a technical assistance agreement dated February 14, 1983. Both new agreements were entered into at the request of the Saudi Industrial Development Fund.
 
 
 18
 The loan application was finally approved in August of 1982. The funds, however, were not released until the middle of 1983. Because of a lack of funds prior to that time, Bseirani and Abou-Khadra both provided additional loans and capital contributions to SPPI. Bseirani also signed an employment agreement with SPPI which, he testified at trial, was necessary to his obtaining a work visa from the Saudi government. This agreement named Bseirani general manager of SPPI.
 
 
 19
 Construction of the manufacturing facility was completed in early 1983, and the first shipment of preinsulated pipe went out in November.
 
 
 20
 D. The Dispute Between Abou-Khadra and Bseirani
 
 
 21
 In November 1983, Bseirani, who had been out of the country on both business and personal matters, returned to Saudi Arabia. He was by this time very concerned that his interest in SPPI had not yet been formalized and again asked Abou-Khadra to take the steps necessary to remedy that situation. Bseirani testified that Abou-Khadra discussed the matter reluctantly and indicated his unwillingness to formalize Bseirani's ownership interest. Soon thereafter, while Abou-Khadra was out of the country, work at SPPI's finance department ceased on Bseirani's orders, and CSE employees were told not to accept any new orders and to collect all sums owed to CSE in the name of AGBI.
 
 
 22
 In a letter dated December 19, 1983, Bseirani told Abou-Khadra that their arrangement at CSE violated Saudi law and thus should be terminated. In the same letter, Bseirani demanded that Abou-Khadra formalize Bseirani's interest in SPPI, or alternatively pay Bseirani $7 million. In response, Abou-Khadra sent two letters to Bseirani, both dated December 19, 1983.[2] The first letter stated that Abou-Khadra had never viewed Bseirani as a partner in the SPPI venture, and that Bseirani's participation in CSE was limited to the role of representing several foreign companies in their dealings with CSE. The second letter dismissed Bseirani as general manager of SPPI and revoked Bseirani's work visa, thus obligating Bseirani to leave Saudi Arabia immediately.
 
 E. The Settlement
 
 23
 On March 7, 1984, after a series of negotiations, Bseirani and Abou-Khadra executed an agreement (the "release") pursuant to which Bseirani, AGBI and Pittcon agreed to release Abou-Khadra, CSE and SPPI from all outstanding claims. In return, Abou-Khadra agreed to pay Bseirani $1,600,000. This sum was to be paid in three installments: $1,600,000 on April 6, 1984; $500,000 on October 6, 1984; and $500,000 on April 6, 1985. Pursuant to the agreement, Abou-Khadra's checks in these amounts were held in escrow by Mahshie.
 
 
 24
 A second, separate agreement (the "agency agreement") between Bseirani and Abou-Khadra was also executed on March 7, 1984. In this agreement, Bseirani granted Abou-Khadra the right to represent Bseirani in the sale of all preinsulated pipe products in Saudi Arabia for a period of five years. Bseirani was to pay Abou-Khadra a commission of ten percent of the gross sales of all products sold. Bseirani also agreed not to enter into a partnership or grant another license for the manufacture of preinsulated pipe in Saudi Arabia for approximately one year after the agreement was executed. In return, Abou-Khadra appointed Bseirani as his exclusive purchasing agent for all United States preinsulated-pipe products and agreed to pay a commission of ten percent above cost in return for Bseirani's services. Mahshie witnessed this agreement. Bseirani received the first installment of $600,000, pursuant to the terms of the release. However, in October 1984, when the second payment became due, Abou-Khadra directed Mahshie not to release the check because Bseirani was purportedly in breach of the agency agreement.
 
 F. Litigation History
 
 25
 Bseirani brought an action against Mahshie in New York State Supreme Court for the release of the funds in escrow. Abou-Khadra, CSE and SPPI then commenced a diversity action in the Northern District against Bseirani, AGBI, Pittcon and Mahshie. It alleged a breach of the CSE arrangement and the agency agreement and sought an injunction barring Mahshie from turning over the two checks remaining in escrow to Bseirani. Bseirani's state court action was settled when Mahshie deposited the two remaining checks into the District Court for the Northern District. In their answer, Bseirani, AGBI and Pittcon asserted seventeen separate counterclaims against Abou-Khadra, CSE and SPPI. The counterclaims were for: (1) an accounting as to CSE for Abou-Khadra's seizure of the business, (2) an accounting as to SPPI for Abou-Khadra's seizure of the business, (3) fraud and conspiracy to defraud Bseirani through the operation of these businesses and the joint business venture, (4) civil RICO violations in the operation of CSE, (5) civil RICO violations in the acquisition and operation of SPPI, (6) civil RICO violations in the operation of the joint Bseirani/Abou-Khadra business venture, (7) tortious interference with employment agreements by enticing Bseirani's employees to work for Abou-Khadra and to convey proprietary information, (8) breach of constructive trust obligations for refusal to recognize Bseirani's contributions to CSE and SPPI, (9) unjust enrichment, (10) conversion of money and property belonging to Bseirani, (11) quantum meruit, (12) trademark infringement of Bseirani's mark "Pittcon," (13) injury to Bseirani's business reputation by the denial that Bseirani was the sole owner of CSE and that he had a forty-nine percent interest in SPPI in violation of New York General Business Law Sec. 368-d, (14) unfair competition through Abou-Khadra's misappropriation of Bseirani's trademark and trade secrets, (15) declaratory judgment as to the true extent of Bseirani's ownership in CSE and SPPI, (16) breach of the release, and (17) breach of contract. In addition, Bseirani, AGBI and Pittcon sued Mahshie and Deeb asserting claims that in large part mirrored the counterclaims asserted against Abou-Khadra, CSE and SPPI. The claims asserted against both Mahshie and Deeb were for fraud and conspiracy to defraud, civil RICO in the conduct of CSE, civil RICO in the conduct of SPPI, and civil RICO in the conduct of the joint Abou-Khadra/Bseirani business venture. A claim of breach of duty of honesty and fair dealing was asserted against Deeb only. Claims of breach of fiduciary duties of an escrow agent, conversion of the escrowed settlement funds, and legal malpractice were asserted only against Mahshie.
 
 
 26
 After a four-week trial, the jury returned a general verdict supplemented by answers to eighty-eight special interrogatories. The jury found against Abou-Khadra, CSE, and SPPI on each of the claims asserted in their suit against Bseirani, AGBI, Pittcon, and Mahshie. On the counterclaims of Bseirani, AGBI, and Pittcon, the jury found Abou-Khadra liable on the two accounting claims (1 & 2), the fraud and conspiracy to defraud claims (3), for civil RICO violations (4-6), for unjust enrichment (9), for conversion (10), for quantum meruit (11), and for breach of the release (16). With respect to the counterclaims against CSE and SPPI, both were found liable for an accounting (1 & 2), for unjust enrichment (9), for conversion (10), and for quantum meruit (11). On Bseirani's claims against Deeb and Mahshie, both were found liable for fraud and conspiracy to defraud, as well as for some of the civil RICO claims. In addition, Deeb was found liable for a breach of a duty of honesty and fair dealing, and Mahshie was found liable for breach of fiduciary duty, conversion, and malpractice.
 
 
 27
 Abou-Khadra, Deeb and Mahshie were all also held liable for punitive damages. Following his denial of appellants' various motions for judgment notwithstanding the verdict and for a new trial, Judge Munson entered judgment against all of the appellants on August 30, 1991, for the amounts listed supra in note 1. Abou-Khadra, CSE, SPPI, Deeb and Mahshie now appeal from that judgment.[3] Bseirani, AGBI and Pittcon cross-appeal.
 
 DISCUSSION
 A. The Appeal
 1. Abou-Khadra, CSE, and SPPI
 
 28
 Abou-Khadra, CSE, and SPPI contend that the jury's answers to the interrogatories were internally inconsistent as well as inconsistent with the general verdict. They argue that these inconsistencies necessitate a new trial.
 
 
 29
 Abou-Khadra, CSE, and SPPI first challenge the judgment entered by Judge Munson insofar as it awarded Bseirani, AGBI and Pittcon $1 million for the breach of the release (counterclaim 16),[4] while simultaneously awarding over $3 million on the claims underlying the release (counterclaims 1-6 & 9-11). This judgment was entered in accordance with the juror interrogatories, which found Abou-Khadra liable both for the breach of the March 1984 release and for the claims underlying that agreement.
 
 
 30
 Although the award of damages both for the breach of the release and on the underlying claims is obviously troubling, the double award did not result from an inconsistency among the jury's answers to the interrogatories or between those answers and the general verdict. Rather, it resulted from the district judge's instruction to the jury that it was not to consider the release as a bar to liability on any of the other claims that Bseirani, AGBI and Pittcon had asserted against Abou-Khadra, CSE, and SPPI. The jury's answers to the interrogatories, and its general verdict, were consistent with this instruction.
 
 
 31
 The real issue is whether this instruction, the corresponding interrogatories, and the judgment, all of which allowed damages to be awarded against Abou-Khadra both for the breach of the release and on the underlying claims, were in error. However, no timely objection was made to the instruction or to the interrogatories in the district court,[5] and we may reverse on this ground only if "the district court committed plain error in its charge and interrogatories." Schaafsma v. Morin Vermont Corp., 802 F.2d 629, 636 (2d Cir.1986). An error is plain if it results in a miscarriage of justice, or if it is an obvious instance of misapplied law. Air et Chaleur, S.A. v. Janeway, 757 F.2d 489, 494 (2d Cir.1985).
 
 
 32
 In support of their argument, Abou-Khadra, CSE and SPPI rely on New York General Obligations Law Section 15-501.3, which requires a litigant to select his or her remedy--either damages for the breach of a release or damages on the underlying claims. See Plant City Steel Corp. v. National Mach. Exch., Inc., 23 N.Y.2d 472, 477, 297 N.Y.S.2d 559, 245 N.E.2d 213 (1969). Section 15-501.3 states that
 
 
 33
 [i]f an executory accord is not performed according to its terms by one party, the other party shall be entitled either to assert his rights under the claim, cause of action, contract, obligation, lease, mortgage or other security interest which is the subject of the accord, or to assert his right under the accord.
 
 
 34
 N.Y.Gen.Oblig. Law Sec. 15-501.3 (McKinney 1989).[6] Abou-Khadra, CSE, and SPPI argue that this provision bars recovery on what are mutually exclusive claims and requires a litigant to elect his or her remedy--either compensation for the breach of the accord, or damages on the claims that underlie the accord. We agree. Indeed, to allow recovery on both claims would result in a partial double recovery.[7] Because a double recovery is an obvious mistake of law, the district court's entering of a judgment that disregarded Section 15-501.3 was plain error.
 
 
 35
 Abou-Khadra, CSE, and SPPI ask us to remand for a new trial. We do not agree that a remedy so wasteful of judicial resources is appropriate in light of the fact that Abou-Khadra, CSE, and SPPI failed to raise this issue in a timely manner in the district court. Had they done so, Bseirani, AGBI, and Pittcon would have had to elect which claim--damages for the breach of the release or damages on the underlying claims--went to the jury. See Plant City Steel, 23 N.Y.2d at 477, 297 N.Y.S.2d 559, 245 N.E.2d 213 (Proper procedure under Section 15-501.3 "requires the court to determine the accord issue. If the accord has been breached the plaintiff can make his election."). Having not raised the issue in a timely fashion, Abou-Khadra, CSE, and SPPI are in no position to ask for a new trial.
 
 
 36
 However, the double recovery can be remedied without a new trial. Under Section 15-501.3, Bseirani, AGBI, and Pittcon were entitled to collect damages either for the breach of the release or on the claims underlying the release. We can, without expending resources on a new trial, simply order on remand to the district court exclusion from the judgment against Abou-Khadra (the only party against whom a $1 million judgment for breach of the release was entered, see Note 4, supra ) of the $1 million in damages awarded for breach of the release. This gives Bseirani, AGBI, and Pittcon the higher of the two overlapping awards. Another $600,000 must also be excluded as a credit to Abou-Khadra for the payment actually made under the release. Corresponding adjustments for punitive damages and interest should be made. For similar reasons, $600,000 should be subtracted from the judgments against CSE and SPPI, who were also parties to the release.
 
 
 37
 Abou-Khadra next argues that the jury's answers to interrogatories regarding the various RICO claims were inconsistent. The jury found that Abou-Khadra had conducted the overall business venture between himself and Bseirani through a pattern of racketeering activity, in violation of 18 U.S.C. Secs. 1962(c), 1964(c). But the jury found that Abou-Khadra had not conducted CSE or SPPI through a pattern of racketeering activity. Abou-Khadra argues that these answers were inconsistent because there was no evidence that the business venture had any meaning or activity apart from CSE and SPPI. Accordingly, Abou-Khadra asks us to vacate the portion of the judgment corresponding to the finding that he had conducted the overall business venture through a pattern of racketeering activity and to remand for a new trial.
 
 
 38
 It is unclear whether this claim was raised in the district court. However, we need not reach that question because, even if there was an inconsistency in the jury's answers to the RICO interrogatories, Abou-Khadra was in no way harmed as a result. The jury awarded Bseirani $1,930,500 as damages flowing from Abou-Khadra's conduct of the overall business activity, but it also found that Bseirani had suffered the same $1,930,500 in damages as a result of Abou-Khadra's acquisition of SPPI through a pattern of racketeering activity. Abou-Khadra does not challenge this latter verdict. Judge Munson, in entering judgment against Abou-Khadra, did not double count the damages found as a result of both RICO violations. Rather, because the jury had held that the two RICO damage awards were coextensive, as well as with amounts awarded on other claims against Abou-Khadra, Judge Munson made a single award of $1,930,500 (trebled) to account for Abou-Khadra's entire RICO liability. Any inconsistency in the jury's findings was thus harmless.
 
 
 39
 Abou-Khadra next argues that the jury instruction on the definition of a RICO enterprise did not adequately explain the requirements for the overall business relationship between Abou-Khadra and Bseirani to qualify as an "association-in-fact" and thus a RICO enterprise. Abou-Khadra never objected to the instruction below and, even if the instruction given was improper, it had no effect on the amount of the judgment against Abou-Khadra for reasons stated above.[8]
 
 
 40
 Finally, Abou-Khadra argues that the district court should not have permitted Bseirani to recover for fraud and RICO violations that, Abou-Khadra asserts, were simply claims that the CSE and SPPI contracts were breached. See Highland Sec. Co. v. Hecht, 145 A.D.2d 393, 536 N.Y.S.2d 67 (1988). This claim also was not raised in the district court and hardly constitutes plain error. There was evidence that false representations were made by Abou-Khadra to induce Bseirani to invest in SPPI. Whether, if the issue had been pursued at trial, the district court would have perceived the issue as a breach of contract is thus unclear, and we find no plain error justifying a retrial. In sum, we affirm the findings of liability as to Abou-Khadra, CSE, and SPPI. However, we vacate the judgment entered against Abou-Khadra and remand to the district court to modify that judgment by subtracting $1,600,000 from its compensatory portion, with a corresponding adjustment for interest, and by subtracting $1 million from its punitive portion that relates to the breach of the release, again with a corresponding adjustment for interest. Six hundred thousand dollars must also be subtracted from the judgments against CSE and SPPI, for reasons stated above. In making these modifications, the district court should clarify the extent to which the judgments against Abou-Khadra, CSE, and SPPI are overlapping awards of damages, and ensure that Bseirani, AGBI, and Pittcon do not recover two or three times for the same injury.[9]
 
 2. Tony Deeb
 
 41
 Deeb was found liable for fraud and conspiracy to defraud, conspiracy to acquire from Bseirani a forty-nine percent interest in SPPI through a pattern of racketeering activity, conspiracy to conduct the overall business venture between Abou-Khadra and Bseirani through a pattern of racketeering activity, and breach of a duty of honesty and fair dealing. Punitive damages were also assessed against Deeb. He makes numerous claims on appeal, many of which were raised by Abou-Khadra, CSE, and SPPI. However, because we agree with Deeb's contention that there was insufficient evidence to support any of the findings against him, we discuss only his insufficiency claim.
 
 
 42
 After the jury returned with its verdict, Deeb moved for a judgment notwithstanding the verdict on the ground that there was insufficient evidence to support the verdict against him. This motion was denied, and Deeb argues on appeal that its denial was in error. In reviewing the denial of a motion for a judgment notwithstanding the verdict, the "evidence must be viewed in the light most favorable to the party against whom the motion was made, and that party must be given the benefit of all reasonable inferences that might have been drawn in his favor from the evidence." Bohack Corp. v. Iowa Beef Processors, Inc., 715 F.2d 703, 712 (2d Cir.1983). Moreover, we may reverse the denial of a motion for judgment notwithstanding the verdict only if "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached." Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir.1970).
 
 
 43
 Although Deeb bears a heavy burden, we believe that the denial of the motion here was error. Bseirani's case against Deeb consisted in large part of Bseirani's testimony that Deeb failed to obtain a receipt from Abou-Khadra for the $500,000 check drawn on Bseirani's Swiss bank account and deposited in SPPI's account. However, there is no evidence that Deeb's failure to obtain that receipt harmed Bseirani. Bseirani had both the cancelled check and a bank receipt indicating that the check had been deposited into SPPI's account. Moreover, the internal financial records of SPPI, which became available to Bseirani, listed the deposit as "owner's equity," in substance exactly what a receipt would have indicated. We therefore fail to perceive how Bseirani was harmed by Deeb's failure to obtain a receipt.
 
 
 44
 The only other evidence against Deeb is his participation in February 1982 discussions concerning the timing of Bseirani's formalization of his interest in SPPI. Bseirani asserts that during these conversations Deeb fraudulently recommended that Bseirani postpone the formalization of his interest in SPPI in order to increase the likelihood that the Saudi Industrial Development Fund loan would be approved. Bseirani contends that this advice was incorrect and that the chances of receiving the loan would have been improved if Bseirani's interest had been formalized immediately. However, the testimony that Deeb in fact told Bseirani to postpone formalization in order to better the chances that the loan would be approved is thoroughly undermined by a February 1982 memorandum Deeb sent to Bseirani. The memorandum outlined the advantages and disadvantages of immediate formalization of Bseirani's interest in SPPI. Among other things, it stated that an advantage to formalization was that "SIDF [Saudi Industrial Development Fund] will look more favorably on the venture." While the memorandum concluded with a recommendation that formalization be postponed, the reason for this recommendation was Deeb's understanding that postponement would "save time and money." The existence of the written memorandum belies any claim by Bseirani of being misled. The advice given in the memorandum was explicitly a close judgment call and did not amount even to an untrue statement, much less fraud or breach of a fiduciary obligation.
 
 
 45
 We thus hold that there was insufficient evidence against Deeb to support the jury's verdicts against him, and we reverse the judgment against him in its entirety and order dismissal of the claims against him.
 
 3. George T. Mahshie
 
 46
 Like Deeb, Mahshie was also found liable for fraud and conspiracy to defraud, conspiracy to acquire from Bseirani a forty-nine percent interest in SPPI through a pattern of racketeering activity, and conspiracy to conduct the overall business venture between Abou-Khadra and Bseirani through a pattern of racketeering activity. In addition, Mahshie was found to have breached his fiduciary duty as an escrow agent, to have converted the $1 million that Bseirani was to receive under the release, and to have committed legal malpractice with regard to Bseirani's dealings with Abou-Khadra.
 
 
 47
 The portion of the judgment against Mahshie based on RICO must be reversed. The district court stated to the jury, over Mahshie's objection, "Mr. Mahshie is a 2 percent owner of SPPI, according to the proof, [and] CSE and was associated with the Bseirani/Abou-Khadra business venture.... I, therefore, instruct you that you must find that the Abou-Khadra parties' association with the three enterprises alleged has been established." The district court thus took from the jury the issue of whether Mahshie was associated with RICO enterprises. Mahshie, however, denied during the trial that he was a two-percent owner of SPPI or that he had any connection to the Bseirani/Abou-Khadra joint venture. Although there was strong evidence that Mahshie had once claimed to be a two-percent owner of SPPI, there was also evidence that Bseirani had denied that Mahshie was an owner. Mahshie should have been allowed to go to the jury on the issue of his ownership, and the district court's refusal to allow him to do so was error.
 
 
 48
 Moreover, there is considerable evidence that the jury was confused as to Mahshie's liability for damages under RICO. As noted, the jury was given an interrogatory form containing eighty-eight separate questions. This interrogatory form concluded with three "summary" questions, the third of which asked the jury to determine "[t]otal compensatory damages to Abdallah G. Bseirani, AGB International Management Corporation and Pittcon Preinsulated Pipes Corporation on their claims [against Deeb and Mahshie]." The purpose of this final question was to have the jury total the compensatory damages for which Deeb and Mahshie were liable under RICO. The jury had specifically found that both Deeb and Mahshie had committed a variety of actionable wrongs against Bseirani, AGBI, and Pittcon and that Bseirani, AGBI, and Pittcon had been harmed as a result. In answering the interrogatories related to the damage caused by such wrongs, the jury answered that the damages were the same as those listed in interrogatories related to Abou-Khadra. In answer to the summary question, however, the jury stated "[p]unitive damages only."
 
 
 49
 The court, understandably concerned about the seeming inconsistency between the jury's answers to the interrogatories and its answer to the third summary question, asked the jury to reconsider its answer to that question. Judge Munson thus stated to the jury:
 
 
 50
 I would like to have you answer a question for the parties to this case and the Court ... whether you intended that there are no damages [against Deeb and Mahshie] whatsoever, no compensatory damages whatsoever, or whether you were saying by punitive damages only which was your answer to that question, that you did not wish the verdict to be in excess of the $4,130,500, in other words, if you were to take the answers to the questions that applied only to [Deeb and Mahshie], are you saying that since we have already awarded damages in the total amount that we wish to award damages, we are, therefore, finding no compensatory damages [against Deeb and Mahshie].
 
 
 51
 After returning to the jury room for deliberation, the jury came back to the courtroom and through its foreperson responded "zero, punitive only." Faced with this response, and his conviction that a finding of zero compensatory damages could not be harmonized with the jury's answers to the interrogatories, Judge Munson entered judgment against Deeb and Mahshie according to the jury's answers to the interrogatories. This was done pursuant to Rule 49(b), which provides that, "[w]hen the answers [to the interrogatories] are consistent with each other but one or more is inconsistent with the general verdict, judgment may be entered pursuant to Rule 58 in accordance with the answers, notwithstanding the general verdict." Fed.R.Civ.P. 49(b). As a result, judgment for $12,625,581.46 ($4,130,500 trebled plus interest) in compensatory damages was entered against Mahshie. In addition, another $770,897.26 (including interest) in punitive damages was assessed against Mahshie.
 
 
 52
 The existence of juror confusion is undeniable. In each instance in which the jury assessed damages against Deeb or Mahshie, it stated that these damages were included in damages already awarded to Bseirani, AGBI, or Pittcon under one of the counterclaims asserted against Abou-Khadra, CSE, or SPPI. The answers may have been an attempt by the jury to avoid double or triple recoveries. However, Judge Munson had instructed the jury not to concern itself about the cumulation of damages, and this possible explanation is therefore sheer speculation.
 
 
 53
 In any event, the jury's answer to Judge Munson's post-verdict question--"zero [compensatory damages], punitive only"--is quite unsettling in the context of a $12.6 million judgment for compensatory damages. Rule 49(b) does allow the trial judge to enter a judgment based on the answers to specific interrogatories where those answers find facts that compel a result as a matter of law that is inconsistent with the general verdict. See Elliott v. Watkins Trucking Co., Inc., 406 F.2d 90 (7th Cir.1969). The theory is that the jury, having found such facts, must have reached the general verdict by erroneous legal reasoning that the judge is entitled to correct. However, Rule 49(b) also authorizes the district court to "return the jury for further consideration of its answers and verdict or may order a new trial." We believe that under the present circumstances the district judge should have embraced one of these latter options rather than have entered a judgment for compensatory damages. Whatever might have been the proper course before asking the jury to reconsider its answers, once the jury came back with the answer "zero [compensatory damages], punitive only," the matter should have been pursued. It is not at all clear that the jury was committing an error in legal reasoning that was corrected by entry of the $12.6 million judgment. Moreover, based on this record, a finding that Mahshie caused no monetary loss but is liable for over $700,000 in punitive damages is astonishing. What is clear is that confusion existed, and a clarification should have been sought, perhaps by submitting reframed special verdict questions.
 
 
 54
 Finally, we believe the breach of fiduciary duty, conversion, and malpractice claims against Mahshie must also be retried. The instruction from the court indicating that Mahshie had a two-percent interest in SPPI affected these claims as well as the RICO claims. One thread running throughout Bseirani's case was the contention that Mahshie was acting in league with Abou-Khadra for his, Mahshie's, own interest. The issue of his ownership interest in SPPI--a possible motive for the alleged wrongdoing--was obviously related to this contention, and the court's erroneous instruction regarding it was thus prejudicial.
 
 
 55
 If Bseirani, AGBI, and Pittcon have a verdict on retrial, care must be taken that they are not awarded a double recovery. Some of the claims against Mahshie concern the administration and enforcement of the settlement agreement. Although we see no barrier to the pursuit of such claims, Bseirani, AGBI, and Pittcon may not, for reasons stated, recover compensatory damages on such claims in excess of those awarded on the claims underlying the settlement agreement.
 
 B. The Cross-Appeal
 
 56
 In their cross-appeal, Bseirani, AGBI, and Pittcon challenge only one aspect of the proceedings below--Judge Munson's refusal to award prejudgment interest on the RICO damage awards. Judge Munson refused to award prejudgment interest because he believed that the trebling of the RICO damages adequately compensated Bseirani, AGBI, and Pittcon for the loss of the use of their money during the prejudgment period.
 
 
 57
 Since the RICO statute does not contain any provisions concerning the award of prejudgment interest, the district court had discretion as to whether to award such interest. See Lodges 743 and 1746, Int'l Ass'n of Machinists v. United Aircraft Corp., 534 F.2d 422, 446 (2d Cir.1975) ("Whether to award prejudgment interest in cases arising under federal law has in the absence of a statutory directive been placed in the sound discretion of the district courts."), cert. denied, 429 U.S. 825, 97 S.Ct. 79, 50 L.Ed.2d 87 (1976). Bseirani, AGBI, and Pittcon have offered no cogent reason why Judge Munson's decision not to award prejudgment interest abused that broad discretion.
 
 CONCLUSION
 
 58
 We affirm the jury's findings of liability as to Abou-Khadra, CSE, and SPPI. However, we vacate the judgment entered against these three, and remand to the district court to reenter judgment consistent with the modifications discussed in this opinion. We reverse the judgment entered against Deeb in its entirety and order the complaint against him dismissed. And finally, we reverse and remand for a new trial the claims against Mahshie.
 
 
 
 [1]
 The specific judgments, including interest, trebling where applicable, and punitive damages, were as follows:
 AbouKhadra .... $14,912,144.29
 CSE ............ $ 5,318,322.43
 SPPI ........... $ 5,318,322.43
 Deeb ........... $ 7,386,539.94
 Mahshie ........ $13,396,478.72
 Liability on the compensatory portion of these awards was joint and several as among all of the appellants.
 
 
 [2]
 One of the letters bears the date "19 Dec., 1963." In context, however, this appears to be a typographical error
 
 
 [3]
 Abou-Khadra, CSE, and SPPI do not appeal the jury verdict insofar as it found against them on their claims against Bseirani, AGBI, Pittcon and Mahshie
 
 
 [4]
 The amount of the judgment entered against CSE and SPPI by Judge Munson did not include this $1 million
 
 
 [5]
 Abou-Khadra, CSE, and SPPI raised this issue only in a post-trial Rule 49(b) motion
 
 
 [6]
 The release, which was signed in New York, and which affects the rights of New York citizens, is governed by New York law
 
 
 [7]
 Bseirani, AGBI, and Pittcon argue that the failure of Abou-Khadra, CSE, and SPPI to raise the release as an affirmative defense waived their right to make the double recovery argument. They rely on Rule 8(c) of the Federal Rules of Civil Procedure, which states that "[i]n pleading to a preceding pleading, a party shall set forth affirmatively ... release ... and any other matter constituting an avoidance or affirmative defense," and to the general rule in federal courts that the failure to plead an affirmative defense results in a waiver of that defense. See Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 n. 2 (2d Cir.1988); see also 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure Sec. 1278 (2d ed. 1990). However, this rule has no bearing on the argument that, if Bseirani, AGBI, and Pittcon are allowed to collect damages both for the breach of the release and on the underlying claims, they will be allowed a partial double recovery. This is not an affirmative defense to liability, but rather an argument about the propriety of an award of full damages on two mutually exclusive claims
 Bseirani, AGBI, and Pittcon alternatively contend that the March 1984 release is not an executory accord, and thus that their execution of the release does not subject them to the limitations of Section 15-501.3. An executory accord is an "agreement embodying a promise express or implied to accept at some future time a stipulated performance in satisfaction or discharge in whole or in part of any present claim, cause of action, contract, obligation ... and a promise express or implied to render such performance in satisfaction or in discharge of such claim, cause of action, contract, [or] obligation...." N.Y.Gen.Oblig. Law Sec. 15-501.1 (McKinney 1989). Bseirani, AGBI, and Pittcon argue that the release is not an executory accord because, in return for the $1,600,000 payment, they agreed not only to release present claims but also to undertake the terms of the agency agreement. We disagree. Although the executory accord must release present claims, nothing in Section 15-501.1 prevents it from doing more, as is often the case with settlements. Thus, even if the agency agreement formed part of appellees' consideration for the release, this fact alone does not prevent the release from functioning as an executory accord within the meaning of Section 15-501.3.
 
 
 [8]
 Judge Munson instructed the jury that, in considering the RICO conspiracy charges "[i]t is not necessary for you to find that any mail and wire fraud acts were actually committed when you are considering the conspiracy charged." Appellants contend that this instruction was improper because we have held that "[b]ecause a conspiracy--an agreement to commit predicate acts--cannot by itself cause any injury, we think that Congress presupposed injury-causing overt acts as the basis of civil standing to recover for RICO conspiracy violations ... although an overt act by itself (whether or not injury ensues) is not a requisite element of a section 1962(d) criminal conspiracy violation ... injury from an overt act is necessary and sufficient to establish civil standing for a RICO conspiracy violation." Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 25 (2d Cir.1990) (citations omitted). However, no one objected to this instruction in the district court, and we can reverse only if it was plain error
 The instruction was not plain error. Hecht held only that a RICO plaintiff may not recover damages for acts that are not predicate racketeering acts. Appellants' fear that the jury might have awarded such damages in the instant matter is groundless. Reading the instructions as a whole, we are satisfied that the jury was clearly informed of the various alleged acts that might support an award of damages.
 
 
 [9]
 The judgment could be read to permit Bseirani, AGBI, and Pittcon to recover for the same injury three times, first from Abou-Khadra, then from CSE, and then from SPPI. No one involved in this litigation intended such a result