802 F.2d 629
 Fed. Sec. L. Rep. P 92,952, 6 Fed.R.Serv.3d 101
 Hubert Alle SCHAAFSMA and Marie Schaafsma, Plaintiffs-Appellees,
v.
MORIN VERMONT CORPORATION, Roger A. Morin, Richard A.
Marriner, Onno Kamerling and IMDA, s.a., Ltd., Defendants,
Onno Kamerling, Defendant-Appellant.
Hubert Alle SCHAAFSMA and Marie Schaafsma, Plaintiffs-Appellants,
v.
MORIN VERMONT CORPORATION, Roger A. Morin, Richard A.
Marriner, Onno Kamerling and IMDA, s.a., Ltd., Defendants,
Morin Vermont Corporation, Roger A. Morin, Richard A.
Marriner and IMDA, s.a., Ltd., Defendants-Appellees.
 Nos. 981, 1186, Dockets 85-7719, 85-7733.
 United States Court of Appeals,
Second Circuit.
 Argued April 25, 1986.
Decided Oct. 3, 1986.
 
 Robert B. Hemley, Burlington, Vt. (Dennis R. Pearson, Gravel and Shea, Burlington, Vermont, of counsel), for plaintiffs-appellants/appellees Hubert and Marie Schaafsma.
 Peter V. Gelderman, Westport, Conn. (Jack Stock, Senie, Stock & LaChance, Westport, Conn., of counsel), for defendant-appellant Kamerling.
 Thomas P. Salmon, Bellows Falls, Vt. (Lawrence G. Slason, Salmon & Nostrand, Bellows Falls, Vt., of counsel), for defendants-appellees Morin Vermont Corp., Roger A. Morin, Richard A. Marriner and IMDA, s.a., Ltd.
 Before MANSFIELD, MESKILL and ALTIMARI, Circuit Judges.
 MESKILL, Circuit Judge:
 
 
 1
 This is an appeal and cross-appeal from judgments of the United States District Court for the District of Vermont, Billings, J., entered following a jury trial. The initial judgment, filed June 12, 1985, awarded plaintiffs Hubert Alle Schaafsma and Marie Schaafsma $141,000 compensatory damages and $20,000 attorneys' fees against defendants Onno Kamerling and Morin Vermont Corporation jointly and severally, plus $75,000 in punitive damages against Kamerling and $75,000 in punitive damages against Morin Vermont. Judgment was rendered in favor of defendants Roger Morin, Richard Marriner, IMDA, s.a. and IMDA, Ltd. on all claims. An amended judgment, deleting the award of attorneys' fees, was filed on July 22, 1985. Kamerling appeals from both judgments. The Schaafsmas cross-appeal.
 
 
 2
 We vacate the judgment, reverse in part and remand for further proceedings.
 
 BACKGROUND
 
 3
 This case involves the purchase of real estate in Troy, Vermont. Before describing the transaction, we introduce the players.
 
 
 4
 Plaintiffs Hubert Alle Schaafsma and Marie Schaafsma, a married couple, are citizens of the Netherlands and residents of Kent, England, who desired to purchase investment property in Northern Vermont.
 
 
 5
 Defendant Onno Kamerling is a resident of the Netherlands and a long-time acquaintance of the Schaafsmas. He is an investment consultant who made a practice of representing Dutch people in connection with investments in Vermont real estate.
 
 
 6
 Defendant Roger Morin is a Vermont real estate broker.
 
 
 7
 Defendant Morin Vermont Corporation is a Vermont corporation with its principal place of business in Jay, Vermont. Roger Morin owns fifty percent of the corporation's stock and is a director, vice president and secretary of the corporation. The other fifty percent of the stock belongs to defendant Richard Marriner, a Louisiana resident who is a director, president and treasurer of Morin Vermont.
 
 
 8
 Defendant IMDA, s.a. is a Luxembourg holding corporation owned by Marriner. Kamerling had a power of attorney over its bank account.
 
 
 9
 Defendant IMDA, Ltd., of which Kamerling is sole director, is an investment company established at Kamerling's suggestion on the Isle of Guernsey, the Channel Islands.
 
 
 10
 Lamoille Realty Corporation (Lamoille) was incorporated under Vermont law in 1970 and was engaged in the purchase and sale of real estate in Troy, Vermont. Roger Morin was its vice president and secretary. Richard Marriner was its president, treasurer and sole director. Prior to the events at issue here, one hundred percent of Lamoille's capital stock was owned by Morin Vermont Corporation.
 
 
 11
 In October 1981, at Kamerling's suggestion, the Schaafsmas traveled to Troy, Vermont, for the purpose of inspecting and possibly purchasing land. Kamerling, with some assistance from Morin, showed them several parcels on October 24, including land owned by Lamoille. Kamerling and the Schaafsmas returned to the Lamoille property on October 25. It consisted of two separate parcels. Kamerling told the Schaafsmas that the smaller parcel contained about ten acres, while the larger one contained about ninety acres. Following Kamerling's directions, Mr. Schaafsma walked three of the four boundary lines of the larger parcel, which was roughly rectangular.
 
 
 12
 Later on October 25, soon after this second viewing of the Lamoille property, Mr. Schaafsma and Kamerling drove to Roger Morin's office in Jay, Vermont. There, Morin gave Schaafsma a brochure, also characterized by some of the parties as a "prospectus," on the letterheads of IMDA, s.a. and IMDA, Ltd., describing the "Lamoille Holdings" and told Schaafsma for the first time that the land was owned by the Lamoille Realty Corporation. A sketched map in the brochure showed a large parcel of eighty-nine acres including a portion marked "Wills" and a small parcel of 11.5 acres, for a total of 100.5 acres. Morin stated that he explained to Schaafsma at this time that the parcel marked "Wills" was not then owned by Lamoille. Schaafsma claims that no such statement was made. The total price quoted to Schaafsma for the Lamoille land was $100,000, although the price quoted by Morin to Kamerling for the same land had been $65,000.
 
 
 13
 When Schaafsma expressed an interest in buying the Lamoille land, Kamerling and Morin suggested that he buy all of Lamoille Realty Corporation's stock instead, the land being the corporation's sole asset. Kamerling maintains that he told Schaafsma that structuring the purchase of the land as a purchase of the corporation would be advantageous from a tax standpoint. According to Schaafsma, it made no difference to him and his wife whether the purchase was structured as a stock or land transaction, as long as the transaction left them owning the land.
 
 
 14
 After meeting with Morin and Kamerling, Schaafsma returned to the hotel where he had been staying with his wife. Mr. and Mrs. Schaafsma discussed the Lamoille land and then told Kamerling that they wanted to buy it. Kamerling told them to send a deposit of $10,000 to an account of IMDA, s.a. in Holland. The Schaafsmas returned to Europe where, on November 6, 1981, they transmitted the $10,000 deposit to that account. On December 3, 1981, they sent the $90,000 remainder of the purchase price to the same account.
 
 
 15
 Morin and Kamerling knew at the time of their October 25 meeting with Mr. Schaafsma that Lamoille did not then own the ten acre parcel marked "Wills" on the Lamoille brochure. That parcel was purchased for Lamoille in early January 1982. Both Kamerling and Morin claim not to have known at the time of the meeting that the Lamoille holdings amounted to only 75.4 acres, although Morin concedes that the actual acreage could easily have been determined. When the Wills parcel was added, the total acreage owned by Lamoille was 85.5 acres, fifteen acres less than had been promised to the Schaafsmas.
 
 
 16
 Morin says he learned of a possible shortfall in January 1982. He discussed the matter with Kamerling, suggesting that a second Wills parcel could be added to the property in order to bring the total up to about one hundred acres. In response to the Schaafsmas' request for an official survey of the land they were purchasing, Morin sent a map on which this second Wills parcel, but not the first, was delineated. Kamerling presented the map to the Schaafsmas during a visit to their home in England in mid-February 1982. According to Mr. Schaafsma, Kamerling described the map as an official, registered survey map and stated that about fifteen acres of the second Wills parcel were included in the Lamoille holdings. Schaafsma asked Kamerling when he would receive documents indicating that ownership of Lamoille had been transferred to him and his wife. He testified that Kamerling told him such a corporate transfer took from six to eight months.
 
 
 17
 Morin acknowledged that such corporate transfers actually take only a couple of days to complete. It was not the transfer but the need to make up the shortfall that required the additional time. Morin's attempts to negotiate an acceptable purchase price for the second Wills parcel failed. Morin also claims that the maps presented to the Schaafsmas in February were never registered anywhere.
 
 
 18
 In August 1982, Mr. Schaafsma telephoned Kamerling and Morin, threatening legal action if the corporate transfer documents did not arrive in England by September 15. A packet of documents, including Lamoille stock certificates and a title insurance policy, arrived on September 7, 1982, together with a letter from Kamerling stating that the title insurance policy confirmed the Schaafsmas' ownership of one hundred acres, but noting that "[d]ue to a confusion with the Registrar" the final survey map was not yet available. J.App. at 44.
 
 
 19
 In November 1982, the Schaafsmas received a second survey map, again described by Kamerling in an attached letter as the "official, registered" map. This map excluded the second Wills parcel and included 15.5 acres of other land which actually belonged to Crete Farm, Inc., rather than Lamoille. Mr. Schaafsma wrote to Kamerling noting that the boundary lines and the resulting shape of the large parcel shown on the map differed from those shown on the earlier survey and on the brochure and also expressed confusion over the status of the second Wills parcel. In reply, Kamerling's secretary stated that the second Wills parcel was never part of the deal. In a further exchange of letters, Schaafsma asked for clarifications and threatened legal action, while Kamerling defended the correctness of the latest map.
 
 
 20
 In February 1983, shortly after meeting with Kamerling in Montreal, Morin wrote to the Schaafsmas admitting the shortfall in acreage and describing his efforts to find replacement property. Morin proposed to include the Crete Farm property in the purchase in lieu of the second Wills parcel in order to bring the acreage total up to 101 acres.
 
 
 21
 The Schaafsmas refused to accept Morin's offer. Mr. Schaafsma wrote to Morin in April 1983, stating that he wished to rescind the stock purchase and tendering the stock--which had actually been sent to Morin for "safekeeping" at some earlier time--in exchange for the $100,000 purchase price. Tr. II-101. According to Mr. Schaafsma, he and his wife never received a reply to this letter. The Schaafsmas filed this suit in the district court on July 5, 1983. Their complaint, as amended, alleged claims under Vermont common law for fraud and rescission of the land sale, claims under federal and Vermont securities law, and a civil RICO claim. The RICO claim and one of the federal securities claims were withdrawn before trial.
 
 
 22
 The case went to trial in June 1985 before Judge Billings and a jury. Testimony took two days. During a pre-argument conference, Judge Billings told plaintiffs' counsel that he would deliver plaintiffs' requested jury charge "in substance," but that he would be drafting special interrogatories for the jury rather than using the interrogatories plaintiffs had proposed. Tr. IV-6.
 
 
 23
 The charge actually delivered to the jury stated that while the plaintiffs were pleading alternative theories, they could recover only on one of them. Therefore, the court said, the jury "must decide whether this case, in essence, is a securities transaction or a land transaction." Tr. IV-61. The court stated that rescission or its equivalent would be one of plaintiffs' remedies for fraud whether the sale involved stock or land and that rescission would also be available if the jury determined that there had been a mutual mistake as to the amount of land sold to the Schaafsmas.
 
 
 24
 The court then presented the jury with a set of special interrogatories and a verdict form. The first interrogatory was: "Do you find that this case was, in essence, a stock transfer?" J.App. at 109. If the jury answered "no" to this question, it was directed to skip over all other questions dealing with possible liability under state and federal securities laws and to answer "yes" to a subsequent question: "Is this case essentially a land transfer case?" J.App. at 111. The interrogatories permitted the jury to find both mutual mistake and fraud as to the land transaction. They included a section entitled "Damages," but made no mention of the remedy of rescission.
 
 
 25
 No relevant objections were made by either plaintiffs or defendants to the charge or interrogatories. Plaintiffs' counsel indicated during the post-charge conference that he thought the interrogatories clearly provided that the jury could find "multiple violations" by the defendants but that there could be only one recovery. Tr. IV-92-93.
 
 
 26
 After about two hours of deliberation, the jury returned its verdict. It answered "no" to the first question and, therefore, did not answer any other questions dealing with federal or state securities law, finding that this was "essentially a land transfer case." J.App. at 111. The jury then found that there was a mutual mistake as to the amount of land sold to the Schaafsmas and that only Kamerling and Morin Vermont Corporation were "liable" for this mistake. It also found that fraudulent misrepresentations had been made to the Schaafsmas and that such misrepresentations were made only by Kamerling and Morin Vermont. The jury assessed compensatory damages against Kamerling and Morin Vermont of $141,000, the full purchase price plus twelve percent interest from December 1981, the date plaintiffs had made their final payment. The jury also assessed a total of $150,000 punitive damages and $20,000 in attorneys' fees against Kamerling and Morin Vermont. Judgment was entered accordingly against these two defendants, with all other defendants being held not liable.
 
 
 27
 In a post-trial motion for judgment n.o.v. or a new trial, plaintiffs argued that the court had erred in requiring the jury to elect between securities or real property law theories on the basis of the transaction's "essence," citing Landreth Timber Co. v. Landreth, 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692, (1985). The defendants moved for a remittitur of the punitive damages, arguing that the jury's finding of mutual mistake precluded its finding of fraud. Defendants also moved for a remittitur of the attorneys' fees award under Vermont case law prohibiting awards of both attorneys' fees and punitive damages in the same case. Earl v. Tupper, 45 Vt. 275, 287-88 (1873).
 
 
 28
 Judge Billings denied the plaintiffs' motion because of the lack of a timely objection to the charge and interrogatories. He denied the defendants' motion for remittitur of punitive damages, holding that the award was justified by the finding of fraud, but granted the remittitur of attorneys' fees under Earl v. Tupper. An amended judgment was filed on July 22, 1985. Kamerling appeals and the Schaafsmas cross-appeal.
 
 DISCUSSION
 
 29
 Kamerling argues that the jury made inconsistent findings of mutual mistake and fraud and that it was up to the court even absent objection to return the jury to further deliberations in order to reconcile these two findings. He also argues that the court erred in its instructions and interrogatories on the remedies for mutual mistake, particularly as to the inclusion of interest and the availability of punitive damages.
 
 
 30
 In their cross-appeal, the Schaafsmas argue that the court's interrogatories were plainly erroneous because they required the jury to elect between securities law and common law theories of recovery. Despite the lack of a timely objection, they claim a right to a judgment n.o.v. or a new trial on the securities claims. They also argue that it was error to grant a remittitur on the award of attorneys' fees.
 
 1. Inconsistent Answers to Interrogatories
 
 31
 Federal Rule of Civil Procedure 49(b) provides that when a jury returns interrogatory answers which are inconsistent with each other and also inconsistent with the general verdict, then "judgment shall not be entered, but the court shall return the jury for further consideration of its answers and verdict or shall order a new trial." Fed.R.Civ.P. 49(b). Thus, while a party's failure to object to such a double inconsistency carries some weight in our analysis on appeal, see Julien J. Studley, Inc. v. Gulf Oil Corp., 407 F.2d 521, 527 & n. 5 (2d Cir.1969); see also Elston v. Morgan, 440 F.2d 47, 49 (7th Cir.1971), the terms of Rule 49(b) make it the "responsibility of a trial judge to resolve the inconsistency" even when no objection is made. See Elston, 440 F.2d at 49; Turchio v. D/S A/S Den Norske Africa, 509 F.2d 101, 106 (2d Cir.1974); 9 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2513 at 527-28 (1971). But see 5A J. Moore & J. Lucas, Moore's Federal Practice p 49.04 at 49-45 (2d ed. 1986) (any objection to general verdict on grounds of inconsistency with special finding is waived if not timely made).
 
 
 32
 In fairness to trial courts and in order to preserve parties' Seventh Amendment rights, appellate courts "struggle" to find a way of reconciling seemingly inconsistent interrogatory answers and verdicts: " 'Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way.' " Studley, 407 F.2d at 526-27 (quoting Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962)); see Fiacco v. City of Rensselaer, New York, 783 F.2d 319, 325 (2d Cir.1986); Davis v. West Community Hospital, 755 F.2d 455, 465 (5th Cir.1985); Cote v. Estate of Butler, 518 F.2d 157, 161 (2d Cir.1975); cf. Merchant v. Ruhle, 740 F.2d 86, 88-92 (1st Cir.1984) (discussing reconciliation of inconsistent general verdicts). Only when jury verdicts are logically incompatible is it error for the district court not to grant a new trial. Bernardini v. Rederi A/B Saturnus, 512 F.2d 660, 662-64 (2d Cir.1975); see Stone v. City of Chicago, 738 F.2d 896, 899 (7th Cir.1984).
 
 
 33
 Here, little "struggle" is required in order to reconcile the assertedly inconsistent jury findings of mutual mistake and fraud. The jury found that there was a mutual mistake only as to the amount of land owned by Lamoille Realty. That did not preclude the jury from finding that fraudulent misrepresentations were made by Kamerling and Morin Vermont as to other aspects of the land including the boundaries and shape of the large parcel, its road frontage and the ownership of the Wills parcels. The defendants' statements to plaintiffs about the fair value of the land might also have been found to be fraudulent. See Proctor Trust Co. v. Upper Valley Press, Inc., 137 Vt. 346, 350-51, 405 A.2d 1221 (1979); Tetreault v. Campbell, 115 Vt. 369, 374-75, 61 A.2d 591 (1948). Because all of these representations were made to induce the plaintiffs to enter into the land sale contract and could have been found to have been relied upon by them to their detriment, see Anderson v. Knapp, 126 Vt. 129, 133, 225 A.2d 72 (1966); Collier v. Nolan and Brown, 125 Vt. 82, 84-85, 211 A.2d 265 (1965), we need not consider the parties' arguments over whether alleged misrepresentations made after the contract was consummated may also have supported the jury's finding of fraud. Because the fraud and mistake findings were not irreconcilable, the trial court did not err in failing to order further deliberation on them.
 
 2. Remedies for Mutual Mistake
 
 34
 We need not decide whether, as Kamerling contends, the district court erred in permitting awards of interest and punitive damages in connection with a finding of mutual mistake. We have concluded that there was also a valid finding of fraud and it is not disputed that fraud damages may properly include both interest and punitive damages.
 
 
 35
 Of greater concern is Kamerling's argument that there was plain error in the court's failure to include rescission in the interrogatories' section on remedies. The plaintiffs had sought rescission in their complaint and the court had properly charged the jury that rescission was an available remedy for either mutual mistake or fraud. Ferris v. Ferris, 140 Vt. 12, 15, 433 A.2d 304 (1981) (mistake); Negyessy v. Strong, 136 Vt. 193, 194, 388 A.2d 383 (1978) (fraud); Collier v. Nolan and Brown, 125 Vt. at 85, 211 A.2d 265 (fraud). The interrogatories presented to the jury, however, failed to include rescission. Defendants did not object to this omission.
 
 
 36
 Ordinarily, defendants' failure to object would be fatal to this claim on appeal. Sheffield Commercial Corp. v. Clemente, 792 F.2d 282, 285-86 (2d Cir.1986).
 
 
 37
 However, in the rare case where the record discloses an error that is "plain and may result in a miscarriage of justice", McNamara v. Dionne, 298 F.2d 352, 355 (2d Cir.1962), we will take cognizance of it though timely objection was not made. Williams v. City of New York, 508 F.2d 356, 362 (2d Cir.1974).
 
 
 38
 Sheffield, 792 F.2d at 286. We hold that such an error occurred here.
 
 
 39
 As an alternative to rescission, plaintiffs here could properly have been awarded "such damages as they suffered by fraud." Collier v. Nolan and Brown, 125 Vt. at 85, 211 A.2d 265. "The measure of damages for fraud is the difference between the actual fair market value of the property when purchased and the value it would have had at that time if as represented." Proctor Trust Co. v. Upper Valley Press, Inc., 137 Vt. at 352, 405 A.2d 1221 (emphasis added). By contrast, the compensatory damages awarded here amounted to the full purchase price paid by the Schaafsmas, plus interest. Such a recovery is permissible as a matter of law only in conjunction with a rescission of the contract of sale. Collier v. Nolan and Brown, 125 Vt. at 85, 211 A.2d 265; Land Finance Corp. v. Sherwin Electric Co., 102 Vt. 73, 81-82, 146 A. 72 (1929). Allowing them to receive such a refund while also allowing them to retain ownership of the land, or the stock that represents the land, "result[s] in a clear windfall to [plaintiffs] at [defendants'] expense." Sheffield, 792 F.2d at 286 (footnote omitted).
 
 
 40
 The district court could not have intended such an inequitable result. The court may have presumed that the sale contract had, in effect, already been rescinded, given Mr. Schaafsma's testimony that the Lamoille stock had been returned to Morin. However, documents submitted to the court in connection with defendants' motion to set aside the verdict indicate that no rescission has occurred. The documents include a request that Morin send the Lamoille stock certificates to the Schaafsmas' attorney.
 
 
 41
 The judgment on its face makes no mention of the return of the stock. However, the parties, the court and the jury--in light of the court's instructions--all apparently presumed that it had taken place, or would take place as a part of a resolution of this suit in the plaintiffs' favor. Accordingly, we vacate the judgment and remand to the district court for clarification on this point.
 
 
 42
 3. Forced Election Between Securities Law and Common Law
 
 
 43
 The main issue presented by the Schaafsmas' cross-appeal is whether the district court committed plain error in its charge and interrogatories by requiring the jury to elect between securities law and common law theories of the case based on an initial finding of the case's "essence." Unless this was plain error, plaintiffs' failure to object to the charge and interrogatories on this ground precludes our review. Sheffield, 792 F.2d at 285-86; see United States v. Heyward-Robinson Co., 430 F.2d 1077, 1083-84 (2d Cir.1970); Fed.R.Civ.P. 51. We conclude that the error here is reviewable because it was plain and egregious. See Williams v. City of New York, 508 F.2d 356, 362 (2d Cir.1974). Moreover, the purpose of the contemporaneous objection rule, which is to alert the trial judge to his error so that he can correct it, was largely satisfied by the plaintiffs' submission of interrogatories requiring separate jury findings on the common law and securities law claims.
 
 
 44
 Landreth Timber Co. v. Landreth, 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985), was decided just days before this case went to trial and the district court specifically indicated during trial that it was aware of the Landreth decision. In Landreth, the Supreme Court rejected the "sale of business" doctrine and held that the federal securities laws apply to the sale of one hundred percent of the stock of a closely held corporation. The Court rejected application of the "economic realities" test--a test quite similar to the "essence" test used by the court here--to instruments carrying the label "stock," id. at ----, 105 S.Ct. at 2303-06, and stated that such instruments possessing " 'some of the significant characteristics typically associated with' stock" were within the coverage of the securities laws. Id. at ----, 105 S.Ct. at 2302 (quoting United Housing Foundation v. Forman, 421 U.S. 837, 851, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975)). The characteristics usually associated with stock are the right to receive dividends contingent upon an apportionment of profits, negotiability, the ability to be pledged or hypothecated, the conferring of voting rights in proportion to the number of shares owned and the capacity to appreciate in value. --- U.S. at ----, 105 S.Ct. at 2301.
 
 
 45
 Here, the undisputed evidence as to the characteristics of the Lamoille Realty Corporation stock indicated that it could be transferred and sold, that it carried a right to dividends, that it could increase in value and that it could be pledged or hypothecated as collateral for a loan. Pursuant to the consenting vote of the two prior shareholders, Marriner and Morin, formal stock certificates were issued to the Schaafsmas in connection with the transfer of Lamoille Realty to them.
 
 
 46
 On this evidence, the error below was not confined to an improper application of an "economic realities" test. It was error to submit to the jury the question of whether the federal securities laws should apply. The instruments here were "securities," see 15 U.S.C. Sec. 77b(1) (1982), as a matter of law. Landreth, 471 U.S. at ----, 105 S.Ct. at 2305; SEC v. C.M. Joiner Leasing Corp., 320 U.S. 344, 351, 64 S.Ct. 120, 123, 88 L.Ed. 88 (1943) (contrasting instruments meeting the description of "stock" on their face to other "[n]ovel, uncommon, or irregular devices" for which coverage by the securities laws is a question of fact); cf. Great Western Bank & Trust v. Kotz, 532 F.2d 1252, 1255 (9th Cir.1976) (coverage of unsecured note is question of fact); Tarvestad v. United States, 418 F.2d 1043, 1048 (8th Cir.1969) (coverage of partial assignment of mortgage a question of fact), cert. denied, 397 U.S. 935, 90 S.Ct. 944, 25 L.Ed.2d 116 (1970).
 
 
 47
 This error in the instructions and interrogatories is a ground for reversal only if it was prejudicial to the plaintiffs. National Railroad Passenger Corp. v. One 25,900 Square Foot Parcel of Land, 766 F.2d 685, 688 (2d Cir.1985); Fed.R.Civ.P. 61. We conclude that it was. Defendants do not dispute plaintiffs' claim that Kamerling and Morin Vermont Corporation, the only two parties against whom damages have been awarded, are an "impecunious" individual and an "empty corporate shell." Br. of Plaintiffs-Appellants at 33. If plaintiffs can prove a violation of 15 U.S.C. Sec. 77l (1982), they might be able to reach other, solvent defendants who were exonerated in the first trial either under the reasonable knowledge standard of section 77l itself or under a "controlling person" theory. See 15 U.S.C. Sec. 77o (1982).
 
 
 48
 We remand for a new trial on plaintiffs' federal securities claim, but we do not go so far as to grant their request for a judgment n.o.v. The latter would be proper in this case only if there were " 'such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against [the plaintiffs].' " Newmont Mines Ltd. v. Hanover Insurance Co., 784 F.2d 127, 132 (2d Cir.1986) (quoting Mallis v. Bankers Trust Co., 717 F.2d 683, 688-89 (2d Cir.1983)). We cannot say that no reasonable jury could find against plaintiffs under section 77o, which provides that a "controlling person" is not liable for the misdeeds of a controlled person if "the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." Cf. Gordon v. Burr, 506 F.2d 1080, 1085-86 (2d Cir.1974); Lanza v. Drexel & Co., 479 F.2d 1277, 1299 (2d Cir.1973) (in banc). The liability of the various defendants under sections 77l and 77o will thus depend on the resolution of this and other questions of fact on remand.
 
 
 49
 We also remand for a new trial on the plaintiffs' claim under Vermont securities law, Vt.Stat.Ann. tit. IX, Sec. 4225 (1984), although we note that the plaintiffs face an additional hurdle on their road to recovery under this statute. Vermont has defined "security" for the purpose of its own securities laws to be "an investment of money ... in a common enterprise ... with an expectation of profits solely from the efforts of others." Northern Terminals v. Leno, 136 Vt. 369, 371, 392 A.2d 419 (1978) (citing SEC v. W.J. Howey Co., 328 U.S. 293, 298, 66 S.Ct. 1100, 1102, 90 L.Ed. 1244 (1946) ). It will be up to the district court on remand to decide whether Vermont courts would adopt a different definition today in accordance with current federal law as expressed in Landreth.
 
 
 50
 Vermont also exempts from the coverage of its securities laws a sale of stock which is an "isolated transaction." Vt.Stat.Ann. tit. IX, Sec. 4204(3). The district court ruled during trial, however, that the burden was on defendants to plead as an affirmative defense that the sale of stock to the Schaafsmas was an isolated transaction. The court held that their failure to so plead was a waiver of the defense. This appears to be a correct application of Vermont law, see R. Brown & Sons, Inc. v. Credit Alliance Corp., 144 Vt. 142, 145-46, 473 A.2d 1168 (1984) (Billings, C.J.), and it is not challenged on this appeal. Accordingly, we will not disturb it.
 
 4. Attorneys Fees
 
 51
 The Schaafsmas claim attorneys' fees only under Vermont law. Vt.Stat.Ann. tit. IX, Sec. 4225; Br. of Plaintiffs-Appellants at 4. They are free to seek such fees, if they prevail, at the new trial on their state securities claim.
 
 CONCLUSION
 
 52
 On Kamerling's appeal, we vacate the judgment of the district court and remand for clarification of the remedies awarded for fraud and mutual mistake.
 
 
 53
 On the Schaafsmas' cross-appeal, we reverse and remand for a new trial on the state and federal securities law claims.
 
 
 54
 The parties shall bear their own costs.