**P.K. VICHARE, Plaintiff–Appellant,**

v.

**AMBAC INC. and AMBAC Indemnity Corp., Defendants–Appellees.**

**No. 2014, Docket 96–7201.**

United States Court of Appeals, Second Circuit.

Argued Aug. 7, 1996.

Decided Nov. 27, 1996.

Lawrence R. Sandak, New York City (Sive, Paget & Riesel, P.C., New York City, of counsel), for Plaintiff–Appellant.

Bettina B. Plevan, New York City (Aliza F. Herzberg, John F. Fullerton, III, Proskauer Rose Goetz & Mendelsohn LLP, New York City, of counsel), for Defendants–Appellees.

Before: MESKILL, CALABRESI, and PARKER, Circuit Judges.

PARKER, Circuit Judge:

P.K. Vichare, plaintiff-appellant, brought suit in the Southern District of New York (Sidney H. Stein, *Judge*), alleging that defendant AMBAC Indemnity Corp. and its parent AMBAC Inc. (collectively, "AMBAC") discriminated against him on the basis of race or national origin (Vichare is Indian) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* The case was tried to a jury, which returned a verdict

for AMBAC. The jury also delivered a statement concurrent with its verdict. Judge Stein entered judgment for AMBAC. Vichare appeals, arguing (1) that the jury's statement should not have been permitted, and, in the event, impermissibly qualified and compromised the verdict, and (2) that the district court incorrectly instructed the jury regarding the admissibility of after-acquired evidence and burden of proof. We affirm.

## I. BACKGROUND.

In 1989, P.K. Vichare, a naturalized citizen of Indian origin, began working at AMBAC as a First Vice President and AMBAC's Director of Technology. AMBAC's principal business is insuring municipal bonds. Shortly after his arrival at AMBAC, Vichare retained the services of a computer consulting firm called Computer Software Services ("CSS"), which in turn retained many programmers of Indian origin. Vichare was promoted to Senior Vice President in July of 1989. The day-to-day operations of AMBAC were, at the time Vichare arrived at AMBAC, run by a Management Committee. Vichare was never put on this committee, although there were non-Indian Senior Vice Presidents on the committee. AMBAC terminated its relationship with CSS midway through 1990 because the project for which CSS had been hired was completed. In 1992, the Management Committee was reorganized as the Operating Committee; Vichare was not put on this either. Vichare's uncorroborated testimony was that several members of the Management Committee made racial remarks about Indians and that he received "disappointing" bonuses despite good performance reviews. In March 1993, Vichare was told that he was to begin reporting directly to the President of AMBAC, Phillip Lassiter. This relationship was short-lived. On May 11, 1993, Lassiter replaced Vichare as Director of Technology; Vichare was given the title of Chief Technologist, and his salary was reduced. He was fired August 30, 1993.

## II. PROCEEDINGS BELOW.

Vichare sued AMBAC under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., in federal district court, alleging that the adverse employment decisions made against him were the result of illegal discrimination based on his race and national origin. Specifically, Vichare claimed that he had been denied membership on the Management Committee, denied membership on the Operating Committee, paid less than comparable AMBAC employees, demoted, and finally fired due to his race and national origin. AMBAC, on the other hand, claimed that Vichare had been demoted and dismissed because of his performance, personality, poor rapport with the users of the computer systems he supervised, and lack of familiarity with the business side of AMBAC's work.

During the discovery phase of the litigation, AMBAC uncovered evidence that, it alleged, showed that Vichare had received secret kickback payments from the subcontractor CSS. AMBAC filed a counterclaim against Vichare based on this evidence, on the theory that Vichare had breached a fiduciary duty to AMBAC. Vichare moved prior to trial to bifurcate the counterclaim from his Title VII claim, arguing that any after-acquired evidence of impropriety on Vichare's part was irrelevant to the question of whether AMBAC had illegally discriminated against Vichare and would be unfairly prejudicial to Vichare at trial. The court denied this motion.

Near the end of trial, the court decided to deliver a special verdict form to the jury. At the charging conference, Vichare proposed a special verdict form that itemized each of the alleged discriminatory or retaliatory actions taken by AMBAC. The judge rejected this proposal, and gave the jury a special verdict form that lumped the discrimination and retaliation claims together.

The jury then deliberated for two days, October 11 and 12. During that time, it asked several questions of the court, and indicated that it was having trouble reaching unanimity.

On October 13, the jury again indicated that it had not reached unanimity and that it seemed unlikely to do so. The court then entertained proposals from counsel on ways to revise the special verdict form. The judge

delivered a civil *Allen* charge to the jury, urging it to continue deliberations and attempt to reach a verdict. The court then received a note from the jury asking whether it could be informed of Vichare's approximate legal costs. While the court was determining how to react to this request, the jury sent another note. This note asked, "May we preface our decision with a statement from the jury?" The court, construing this to mean that it had reached a verdict, told the marshal to ask the jury whether it had in fact done so. The jury responded, by note, "Your answer may help us reach a decision." Counsel for Vichare then renewed his motion to have the special verdict form that was in front of the jury substituted with his proposed form. Counsel for AMBAC stated that her understanding of the jury's most recent note was that it might reach unanimity if allowed to make a statement. The judge told the marshal to tell the jury that it would be permitted to make a statement. Vichare objected to this instruction being given by the marshal; the judge therefore brought the jurors in and told them himself. The court then said, "Please retire to the jury room and reach your verdict, write your statement out, and you can come out here and deliver both to the Court." Approximately two hours later, the jury sent a note to the judge that stated, "The jury requests that our statement be read prior to the verdict. We have reached a verdict." The jury then returned to the courtroom. The judge stated that "We will allow you to read your statement prior to the reading of the verdict. You are the foreperson of the jury, do you wish to read a statement on behalf of the jury?" The foreperson then stated the following:

> After arduous deliberation, the jury wishes to state the following:
>
> It is the consensus of this jury that AMBAC allowed overt discrimination within its ranks to be directed towards P.K. Vichare. We would like to emphasize that this type of behavior is unacceptable and should not be tolerated.

Unfortunately, due to the very narrow constraints of the law as presented to the jury, we feel Mr. Vichare was unable to adequately meet his burden of proof.

The clerk then asked the foreperson how they had found on the first question posed on the special verdict form, the one regarding Vichare's claims. The foreperson stated, "We had to say no." The clerk then asked how they had found as to the second special verdict, the one regarding AMBAC's counterclaim. The foreperson responded, "We state no." Vichare moved that the jury be returned to deliberation, as the jury had reached an inconsistent verdict. The court denied this motion and dismissed the jury. The court entered judgment for defendant on the main claim and judgment for plaintiff on the counterclaim.

## III. DISCUSSION.

Vichare makes the following arguments on this appeal: (A) the judge, by permitting the jury to make its statement, improperly induced unanimity among the jurors; (B) the jury's statement rendered the resulting verdict an impermissible qualified verdict; (C) the jury's statement rendered the resulting verdict an impermissible compromise verdict; (D) the content of the jury's statement entitles Vichare to a judgment in his favor; (E) several statements made by Judge Stein impermissibly coerced the jury into reaching a verdict; (F) the judge's formulation of the special verdict questions misled the jury; (G) the judge's instructions to the jury regarding the admissibility of AMBAC's after-acquired evidence misstated the law; and (H) the judge's instructions to the jury regarding Vichare's burden of proof misstated the law. We address these assertions in order.

### A. *Allowing the Jury to Make a Pre–Verdict Statement.*

■ Vichare raises several issues on appeal based on the statement that the jury delivered with its verdict.[1] The first of these

---

1. Vichare offers juror affidavits in support of his arguments. Generally, juror affidavits and testimony are not admissible to impeach a verdict. Fed.R.Evid. 606(b); *see generally Tanner v. United States*, 483 U.S. 107, 116–17, 107 S.Ct. 2739, 2745–46, 97 L.Ed.2d 90 (1987). The recognized exceptions are where the affidavits allege "extraneous influence" on the jury, *Tanner*, 483 U.S. at

is that the trial court, by permitting the statement in order to break a deadlock, improperly induced unanimity among the jury.

The parties dispute whether Vichare has preserved this issue for appeal. They also dispute what our standard of review should be if we find that Vichare waived this argument: Vichare claims that this Circuit applies the "plain error" standard of review to waived claims, *see, e.g., Metromedia Co. v. Fugazy*, 983 F.2d 350, 362 (2d Cir.1992); *Air Et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 493–94 (2d Cir.1985), while AMBAC claims that we apply the "fundamental error" standard, *see, e.g., Travelers Indem. Co. v. Scor Reinsurance Co.*, 62 F.3d 74, 79 (2d Cir. 1995); *Mondave v. Long Island Jewish Med. Ctr.*, 501 F.2d 1065, 1072 (2d Cir.1974). We need not, however, address either of these issues, because even assuming *arguendo* that Vichare preserved this issue there is no error, let alone "plain" or "fundamental" error.

■ Vichare points to no cases holding that allowing a jury in a civil case to make a statement is error as a matter of law, or that "inducing" a jury in a civil case to unanimity by allowing them to make a statement is error as a matter of law.[2] Indeed, there are other long-accepted ways in which trial courts may encourage unanimity. For example, we have long upheld the use of *Allen* charges. *E.g., United States v. Melendez*, 60 F.3d 41, 50–52 (2d Cir.1995); *United States v. Robinson*, 560 F.2d 507, 516–18 (2d Cir. 1977) (in banc). Decisions whether and when to give an *Allen* charge are within the discretion of the trial court. *See United States v. Martinez*, 446 F.2d 118, 120 (2d Cir.1971) (reviewing for abuse of discretion a trial court's *sua sponte* delivery of an *Allen* charge to the jury after only three hours of deliberation). Similarly, we have held that

when the trial court gives a supplemental charge to the jury regarding applicable law, it "enjoys broad discretion in determining how, and under what circumstances" the charge may be given. *United States v. Civelli*, 883 F.2d 191, 195 (2d Cir.1989). In the *Allen* charge cases, we have articulated the limit of this discretion by stating that the charge may not "coerce undecided jurors into reaching a verdict by abandoning without reason conscientiously held doubts." *United States v. Ruggiero*, 928 F.2d 1289, 1299 (2d Cir.1991) (quoting *Robinson*, 560 F.2d at 517). These cases illustrate that this Court treats allegations of improperly induced unanimity among jurors by balancing the good of efficiency (in the form of avoiding a hung jury) against the evil of injustice (in the form of a verdict that is not the product of the jurors' consciences).

In this case Judge Stein avoided a hung jury and did so in a manner that did not cause the jurors to abandon their consciences: there was, therefore, no abuse of discretion. At the time Judge Stein allowed the statement, the circumstances of the case indicated that the jury was close to hanging and that allowing the requested statement would aid the jurors in resolving their differences. Moreover, the jury's statement that being allowed to make a statement "may help us reach a decision," does not necessarily suggest that some jurors were convinced that the law required a verdict for Vichare, but were willing to trade that result for the opportunity to make a statement: it just as easily suggests that some jurors were convinced that the law required a verdict *against* Vichare, but were frustrated with that result and wanted an outlet for their frustration. On this interpretation, the op-

---

117, 107 S.Ct. at 2746; *Mattox v. United States*, 146 U.S. 140, 149, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892); *Jacobson v. Henderson*, 765 F.2d 12, 14–15 (2d Cir.1985) (per curiam), or a miscommunication of the verdict from the jury, *Attridge v. Cencorp Div. of Dover Technologies Int'l, Inc.*, 836 F.2d 113, 116–17 (2d Cir.1987). As the affidavits offered by Vichare fit within neither of these exceptions, we ignore them.

**2.** Vichare relies on *Williams v. Fermenta Animal Health Co.*, 984 F.2d 261 (8th Cir.1993) (*"Williams I "*), reh'g denied and suggestion for

reh'g en banc denied, 992 F.2d 192 (8th Cir.1993) (*"Williams II "*), for the proposition that "[p]ermitting a jury to return something other than, or in addition to, a verdict is generally error." We read these cases as holding only that where a jury is induced by counsel to make a statement with its verdict and that statement is not inconsistent with the jury's verdict, any error is harmless. *See Williams I*, 984 F.2d at 266. To the extent that these cases can be read to go further than this holding, we decline to follow them.

portunity to make the statement *removed* a danger of jurors compromising their consciences (i.e. by allowing their personal desires to override the law). Confronted with a jury that appeared ready to hang, and ambivalent evidence that the opportunity to make a statement would cause any of the jurors to compromise their consciences, the trial court exercised due discretion when it allowed a statement to be made.

There is of course the possibility that the content of the statement itself could reveal that the jurors *had* impermissibly compromised their consciences. It is for this reason that we consider the practice of allowing such statements to be a precarious one to be used sparingly: there is always the danger that the opportunity to make a statement will infect the jury's deliberations and spoil a jury that would otherwise have yielded a proper verdict. Whether this danger was realized in a particular case must be judged from the content of the statement—an analysis we undertake in sections B and C, below. Allowing the jury in this civil case to make its statement, though, standing alone, was not an abuse of discretion.

### B. *Qualified Verdict.*

■ Vichare argues that the jury's statement rendered the verdict an impermissible "qualified" verdict. He relies primarily on *Rogers v. United States,* 422 U.S. 35, 40–41, 95 S.Ct. 2091, 2095–96, 45 L.Ed.2d 1 (1975). The jury in *Rogers* sent the judge a note during its deliberations asking if the court would accept a verdict, "Guilty as charged with extreme mercy of the Court." *Rogers,* 422 U.S. at 36, 95 S.Ct. at 2093. The court responded affirmatively without notifying the parties of the question or soliciting their input. *Id.* The defendant successfully challenged his conviction on that ground, under Fed.R.Crim.P. 43, which guarantees the defendant in a criminal case the right to be present in every stage of the proceeding. *Id.* at 39, 95 S.Ct. at 2094–95. The Court was unwilling to find the error harmless, particularly since the district judge had not informed the jury that its recommendation would not be binding in any way, or that the jury did not serve any sentencing function.

*Id.* at 40, 95 S.Ct. at 2095. The Court looked to, *inter alia,* decisions of this Court that had reached similar holdings. *Rogers,* 422 U.S. at 39, 95 S.Ct. at 2094–95 (citing *United States v. Schor,* 418 F.2d 26, 29 (2d Cir. 1969)); *id.* (citing *United States v. Glick,* 463 F.2d 491, 494–95 (2d Cir.1972)); *id.* at 40, 95 S.Ct. at 2095 (citing *United States v. Louie Gim Hall,* 245 F.2d 338 (2d Cir.1957)).

The concerns addressed in the above-cited cases are not present in the instant case. For one thing, this is a civil case where the plaintiff does not have the same rights as a defendant in a criminal case. Moreover, as we have seen, Vichare and his counsel were present when the jury made its request. In any event, the jury's choice of the word "statement" to describe its pronouncement displays its understanding that the pronouncement would have no legally binding effect on anyone: in common parlance, a "statement" (unlike a "verdict") is not binding. Moreover, the communications from the jury to the court show a clear understanding that any "statement" would be distinct from their "decision" or "verdict." For example, they said, "May we preface our decision with a statement from the jury?" and "The jury requests that our statement be read prior to our verdict. We have reached a verdict." Finally, and most importantly, the content of the statement does not manifest any intent to be taken as having any legally binding effect. Therefore, the jury did not deliver a qualified verdict.

### C. *Compromise Verdict.*

■ Nor is the verdict a compromise verdict. Traditionally, in order to constitute an impermissible compromise the verdict must, at least, be inconsistent with the facts adduced at trial. *Ajax Hardware Mfg. Corp. v. Industrial Plants Corp.,* 569 F.2d 181, 184 (2d Cir.1977); *see also Maher v. Isthmian S.S. Co.,* 253 F.2d 414, 416–17 (2d Cir.1958). Our decision in *Diamond D Enterprises USA, Inc. v. Steinsvaag,* 979 F.2d 14, 17 (2d Cir.1992), relied upon by Vichare, is not to the contrary: it states that, where a jury not only delivers an insufficient damages award but also exhibits other indicia of compromise, there may be an impermissible compromise

verdict. *Id.* at 17. Vichare ignores the fact that a verdict of insufficient damages—i.e., where a jury finds liability and damages, yet sets damages in an amount inconsistent with any theory of liability offered at trial—is an example of a verdict that is inconsistent with the facts adduced at trial.

In this case there was no such inconsistency: the jury found no liability and no damages. Moreover, the jury's verdict—even if we were to include, as Vichare would have us do, the statement as part of the verdict—is not inconsistent with the facts adduced at trial. The jury's statement bears repeating:

> It is the consensus of this jury, that AMBAC allowed overt discrimination within its ranks to be directed towards P.K. Vichare. We would like to emphasize that this type of behavior is unacceptable and should not be tolerated.

> Unfortunately, due to the very narrow constraints of the law as presented to the jury, we felt that Mr. Vichare was unable to meet his burden of proof.

The jury stated that it found that AMBAC allowed overt discrimination, but that Vichare had not met his burden of proof. The jury was also properly instructed that in order to prevail on a Title VII claim the plaintiff must prove that discrimination was the cause of the adverse employment action. The jury could easily have found on this record that certain persons at AMBAC discriminated against Vichare because of his race or national origin, but that the discrimination did not interfere in any way with his job conditions, such as advancement, pay, or job security. The jury's verdict was not an impermissible compromise. *Cf. Lowe v. Commack Union Free Sch. Dist.,* 886 F.2d 1364, 1377–78 (2d Cir.1989) (in an age-discrimination suit, a jury's statement immediately following a verdict for the defendant, stating that the defendant's hiring practices "have a lot to be desired," and recommending new hiring criteria, including *inter alia* greater emphasis on experience, did not render the verdict an impermissible compromise); *Hong Sai Chee v. Long Island R.R.,* 328 F.2d 711, 712, 712–13 (2d Cir.1964) (no inconsistent verdict where a written statement from eight of the jurors accompanying a verdict for defendant in a negligence suit stated that the defendant was "guilty of not providing sufficient safeguards" and recommending that "some solution be found").

## D. Treating the Jury's Statement as an Answer to an Interrogatory.

For much the same reasons, we reject Vichare's theory that judgment should be entered based on the jury's finding of discrimination, as expressed in its statement, rather than upon the general verdict to which they unanimously agreed. Because, the argument goes, the jury's statement was in essence an answer to an interrogatory accompanying a general verdict, and because this answer was inconsistent with the general verdict, judgment should have been entered for Vichare pursuant to Fed.R.Civ.P. 49(b).[3]

Even if we were to adopt Vichare's theory and treat the statement as an answer to an interrogatory accompanying a general verdict, or, perhaps even more plausibly, a third special verdict accompanying the two court-phrased special verdict questions, Vichare's claim still would fail. If there exists a reading that would reconcile a general verdict with an arguably contradictory answer to an interrogatory, or reconcile arguably contradictory special verdicts, a court should adopt that reading. *Gallick v. Baltimore & O.R.R.,* 372 U.S. 108, 119, 83 S.Ct. 659, 665–66, 9 L.Ed.2d 618 (1963) (general verdict and interrogatories); *Lavoie v. Pacific Press & Shear Co.,* 975 F.2d 48, 53 (2d Cir.1992) (general verdict and interrogatories); *Brooks v. Brattleboro Mem'l Hosp.,* 958 F.2d 525, 529 (2d Cir.1992) (special verdicts); *Auwood v. Harry Brandt Booking Office, Inc.,* 850 F.2d 884, 891 (2d Cir.1988) (special verdicts); *Schaafsma v. Morin Vermont Corp.,* 802 F.2d 629, 634–35 (2d Cir.1986) (general verdict and interrogatories); *Julien J. Studley,*

---

3. Fed.R.Civ.P. 49(b) provides the following:

When the answers [to interrogatories] are consistent with each other but one or more is inconsistent with the general verdict, judgment may be entered pursuant to Rule 58 in accordance with the answers, notwithstanding the general verdict, or the court may return the jury for further consideration of its answers and verdict or may order a new trial.

*Inc. v. Gulf Oil Corp.,* 407 F.2d 521, 526–27 (2d Cir.1969) (general verdict and interrogatories). As we have seen, the jury's statement in this case is reconcilable with the jury's finding for the defendant. We do not, therefore, reach the question of whether a jury statement that was legally irreconcilable with a concurrently delivered general verdict could, on either the answer-to-unasked-interrogatory or additional-special-verdict theory, void the general verdict.

### E. *Coercion.*

■ We also reject Vichare's assertion that Judge Stein coerced the jury into reaching a verdict. The judge delivered a civil *Allen* charge, and then, later, told the jury:

> Ladies and gentlemen of the jury, in response to your last note, let me inform you that you may read a statement to the Court at the time you deliver your verdict.
>
> Please retire to the jury room and reach your verdict, write your statement out, and you can come out here and deliver both to the Court.

He also had made comments throughout the trial that presumed a prompt resolution of the case. For example, when telling the jurors that they would have to return the next day for further deliberations, he stated that "the earlier we start, the sooner you will all be out and able to go to your respective places of work tomorrow." He also told one juror who had expressed concerns about the trial going longer than expected, in an interview out of the presence of the other jurors, that "every one has every intention of completing tomorrow."

As noted in section A., above, we have frequently stated that an *Allen* charge is coercive if it encourages jurors to abandon, without any principled reason, conscientiously held doubts. *See, e.g., United States v. Ruggiero,* 928 F.2d 1289, 1299 (2d Cir.1991); *United States v. Robinson,* 560 F.2d 507, 517 (2d Cir.1977) (in banc). We have upheld jury instructions which included such statements as "[i]t is important that a decision, a verdict be reached here, and I really see no good reason why a decision cannot be reached, bearing in mind what I have said and my cautions to you [regarding abandoning con-

scientiously held doubts]." *Robinson,* 560 F.2d at 511 n. 6. Similarly, we have found no coercion where a judge instructed a jury that they would have to deliberate through the weekend if they did not reach a verdict by Friday. *United States v. Pisani,* 773 F.2d 397, 404 (2d Cir.1985). Judge Stein's statement, "[p]lease retire to the jury room and reach your verdict," seemed to presume that the jury either had reached, or shortly would reach, a verdict. Under the circumstances of this case, the judge had reason to believe that granting permission to make a statement was the final barrier to the arrival of a verdict. Given these circumstances, his statement did little more than express his optimism that the trial would soon be over; it certainly did not put any juror in danger of surrendering conscientiously held beliefs. Likewise, his statement that everyone expected to resolve the case expeditiously did not rise to the level of coercion.

### F. *Formulation of the Special Verdict Questions.*

■ The formulation of special verdict questions rests in the sound discretion of the trial judge, and should be reviewed by an appellate court only for an abuse of that discretion. *Cann v. Ford Motor Co.,* 658 F.2d 54, 58 (2d Cir.1981). Reversal is warranted if the questions mislead or confuse the jury, or if they inaccurately frame the issues to be resolved by the jury. *Id.*

The question on the special verdict form given by the judge to the jury read as follows: "Did plaintiff prove by a preponderance of the evidence that defendants discriminated or retaliated against him?" Vichare had requested a special verdict form that separately listed each of his claims of discrimination:

> Did plaintiff prove by a preponderance of the evidence that defendants discriminated against him by failing to place him on the Management Committee?
>
> .... by failing to place him on the Operating Committee?
>
> .... by paying him less than comparably situated non-Indian Senior Vice Presi-

dents who were not on the Operating Committee? [etc.]

He claims that, because it refused to break down his claims in this fashion, the court confused the jury into thinking that Vichare had to prevail on all of his claims in order to recover. His primary ground for this assertion is the jury's note stating that "[t]he jury cannot agree on all points, we are split down the middle."

█ The court's special verdict questions must be read in conjunction with the judge's charge to the jury. *Romano v. Howarth,* 998 F.2d 101, 104 (2d Cir.1993). In this case, the charge made clear that Vichare could recover on any of his claims. In the section of the instructions concerning damages, for example, the court stated the following:

If you find that AMBAC denied Mr. Vichare a position on the management committee or the operating committee, or both, at least in part because of his race or national origin, then you should award Mr. Vichare damages....

If you find that AMBAC discriminated against Mr. Vichare by paying him less than comparably situated non-Indian and non-Asian-American executives, you should award Mr. Vichare the amount of money that will compensate him for the difference between what he was paid and what he should have been paid, absent the discrimination.

If you find that AMBAC discriminated against Mr. Vichare by dismissing him, then you may award damages. Similarly, if you find that AMBAC retaliated against Mr. Vichare by dismissing him, then you may award him damages.

This message was not only delivered orally to the jurors, but they were allowed, midway through their deliberations, to take a copy of it with them into the jury room. These instructions indicated that each of Vichare's allegations if proven was itself sufficient to support liability. The cases relied upon by Vichare in which there were reversals are inapplicable here, as the special verdict forms in those cases either misstated the law, or presented it in an incomplete fashion. *See Romano,* 998 F.2d at 105–07 (special verdict form failed to provide the Supreme Court's objective criteria on an issue, and erroneously suggested that two inquiries were separate grounds for recovery when one was actually a subset of the other); *Cann,* 658 F.2d at 58 (special verdict form phrased the liability theories conjunctively rather than disjunctively, perhaps leading the jury to believe that plaintiff had to prove each theory to prevail); *Ajax Hardware Mfg. Corp. v. Industrial Plants Corp.,* 569 F.2d 181, 186–87 (2d Cir.1977) (special verdict form withdrew two of three alternative breach of contract theories relied upon by plaintiff, despite the fact that plaintiff had produced sufficient evidence to sustain all three).

G. *After-Acquired Evidence.*

█ Vichare moved prior to trial to bifurcate his Title VII claim from AMBAC's breach of fiduciary duty counterclaim, and to have evidence regarding Vichare's alleged misconduct admitted only in the counterclaim phase. *See* Fed.R.Civ.P. 42(b). Judge Stein denied this motion. We review this denial for abuse of discretion. *Getty Petroleum Corp. v. Island Transp. Corp.,* 862 F.2d 10, 15 (2d Cir.1988).

█ The interests served by bifurcated trials are convenience, negation of prejudice, and judicial efficiency. *See* Fed.R.Civ.P. 42(b). Bifurcation may therefore be appropriate where the evidence offered on two different issues will be wholly distinct, *see, e.g., Katsaros v. Cody,* 744 F.2d 270, 278 (2d Cir.1984) (affirming bifurcation "because the two phases involved different types of evidence"), or where litigation of one issue may obviate the need to try another issue, *Morse/Diesel, Inc. v. Fidelity and Deposit Co.,* 763 F.Supp. 28, 35 (S.D.N.Y.), *modified in part on other grounds,* 768 F.Supp. 115 (S.D.N.Y.1991), *aff'd by summary order,* 1996 WL 481813 (2d Cir. Aug.22, 1996). In this case, none of the interests promoted by Rule 42(b) would have been furthered by bifurcation. The issues of liability and damages are intertwined: Vichare claims that his rate of pay while at AMBAC is evidence of both liability and damages. The litigation of Vichare's claim would not necessarily obviate AMBAC's counterclaim. Several of the same witnesses would have to be called on AM-

BAC's counterclaim as on Vichare's claim. Finally, we cannot say that the allegation of breach of fiduciary duty in this case was so emotionally charged that it necessarily would have prejudiced Vichare in the eyes of the jury. Given these facts, it was well within the discretion of the trial judge to deny Vichare's motion.

■ Vichare also moved for a limiting instruction warning the jury that any evidence of Vichare's alleged breach of fiduciary duty should not be considered on the liability question. Fed.R.Evid. 105 requires the court, upon request, to give a limiting instruction when evidence is admissible on one issue but not on another. Vichare claims here that the trial court erred because it did not "specifically instruct the jury in unequivocal language that the evidence may only be considered for a limited purpose."

We disagree. When counsel for AMBAC began to cross-examine Mr. Vichare on the issue of his relationship to the subcontractors, counsel for Vichare objected and the judge instructed the jury as follows:

Ladies and gentlemen of the jury, as you have heard, Mr. Vichare is alleging that AMBAC unlawfully discriminated against him. As you have also heard, AMBAC is claiming that Mr. Vichare breached his fiduciary obligations to AMBAC.

Those are two separate and distinct issues, each of which you will be asked to make a determination on at the conclusion

of this case. Keep in mind that, whether or not you find that Mr. Vichare violated his fiduciary duties to AMBAC is a totally separate issue as to whether or not AMBAC discriminated against Mr. Vichare.

The Judge also included a statement in his charge to the jury specifically informing it of the limited uses to which the counterclaim evidence could be put.[4] In this charge, the judge warned against mixing claims in three separate ways: he outlined the scenario in which the two claims might interact impermissibly and ordered the jury to avoid this scenario; he clearly stated that the issue of any wrongdoing on Mr. Vichare's part is a "separate and distinct" issue from Vichare's discrimination claims; and he declared the · wrongdoing issue relevant "only" as it impacted upon damages and credibility. The fact that he did not further illuminate his last point by redundantly pointing out that the evidence could *not* be used for the purposes *not* mentioned (e.g. determination of liability), or that he did not use the legal words "limited purpose" or perhaps "inadmissible," is not an abuse of discretion.

■ Vichare also argues that AMBAC should not have been allowed to use its after-acquired evidence to impeach Vichare's credibility. Allowing this use of the evidence, Vichare asserts, will "eviscerate the rule of inadmissibility established by *McKennon* [*v. Nashville Banner Publishing Co.*, 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995) ]." In *McKennon*, the Supreme Court consid-

---

4. The judge charged the jury as follows:

If you find that Mr. Vichare did breach a fiduciary duty or otherwise engaged in severe wrongdoing in connection with his relationship to CSS and Dastur and the extent of his disclosure of that relationship, and if you find that AMBAC did take discriminatory or retaliatory action toward Mr. Vichare, and if you further find that AMBAC was unaware of Mr. Vichare's wrongdoing at the time it took its discriminatory or retaliatory action, you may not use Mr. Vichare's wrongdoing to negate AMBAC's liability for its unlawful acts. In other words, you cannot say, "Even though AMBAC discriminated or retaliated against Mr. Vichare, and even though it did not know about his severe wrongdoing at that time, it would have taken the same action with regard to him had it known of the wrongdoing, and therefore it really did nothing wrong." If AMBAC discriminated or retaliated against Mr.

Vichare and did not know of the severe wrongdoing, if there was wrongdoing, it is still liable regardless of whether it would have taken similar action toward him had it known of the wrongdoing.

The issue whether AMBAC discriminated or retaliated against Mr. Vichare and the issue of whether Mr. Vichare breached a fiduciary duty that he owed to AMBAC or engaged in other severe wrongdoing are related in only two respects. First, if you find that Mr. Vichare did commit severe wrongdoing, it may affect the damages to which Mr. Vichare is entitled if you find that AMBAC is liable for discrimination or retaliation. I will instruct you more fully on that later in these instructions. Second, if you find that Mr. Vichare engaged in severe wrongdoing, you may use that finding when determining his credibility as a witness and what weight, if any, to give his testimony with regard to anything to which he testified.

ered whether an employer could use after-acquired evidence to defeat a plaintiff's cause of action for employment discrimination.[5] *Id.* at ——, 115 S.Ct. at 883. The Court held that such evidence may not bar the employee from recovering, but that it may render the employee ineligible for front-pay and reinstatement. and limit back pay to the period between the unlawful termination and the date on which the discovery was made. *Id.* at ——, 115 S.Ct. at 886.

*McKennon* did not establish a rule of inadmissibility: the Court held on issues of liability and damages, not evidence. Vichare, however, extrapolates the rationale of *McKennon* and argues that the strong federal policy of eradicating discrimination in the workplace overrides the ordinary rule that allows specific acts of a witness to be inquired into on cross-examination if, within the discretion of the trial court, they are deemed probative of untruthfulness, Fed. R.Evid. 608(b). That is, the effect of *McKennon* would be nullified if after-acquired evidence of plaintiff misdoing were admissible at the liability phase of the trial, because the jury might be prejudiced by the evidence and find for the defendant even though it was convinced that the defendant had discriminated illegally.

There are two problems with this argument. First, there are two sides to the 608(b) coin: prejudice is one, probative value is the other. Just as a jury can be prejudiced against the plaintiff by the inclusion of some evidence, it can be misled by the exclusion of other evidence. *See* 28 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure § 6112, at 32 (1993) (accuracy is one of the primary policies implicated by Rule 608). Inaccurate enforcement of anti-discrimination laws does not advance the federal policy against discrimination in the workplace. The one-sided approach advocated by Vichare would ignore this important policy. Second, a safeguard against the danger of prejudice is already in place: we review, for abuse of discretion, the trial court's determination of admissibility under Rule

608(b). *United States v. Bari,* 750 F.2d 1169, 1178 (2d Cir.1984). We see nothing in *McKennon* to suggest that review of Vichare's case under this standard will thwart the federal policy of preventing discrimination in the workplace.

We therefore reach the question of whether it was an abuse of discretion to allow cross-examination of Vichare on the issue of the alleged kickbacks. Vichare himself was the crucial witness called on his claim: the question of his credibility was essential to the case. Furthermore, the allegation that he had been secretly taking kickbacks was obviously relevant to his credibility. Perhaps most importantly, the relevance of the evidence to Vichare's credibility was enhanced by the fact that the evidence arose from the same circumstances that gave rise to Vichare's claim. Given these facts, there was no abuse of discretion. *Cf. Chnapkova v. Koh,* 985 F.2d 79, 82 (2d Cir.1993) (it is an abuse of discretion to forbid cross-examination on the issue of whether the witness has made false statements on tax returns); *United States v. Sperling,* 726 F.2d 69, 75 (2d Cir. 1984) (cross-examination regarding defendant's false credit card application was proper in a prosecution for distributing heroin to show a general lack of credibility); *United States v. Terry,* 702 F.2d 299, 316 (2d Cir. 1983) (cross-examination of an expert witness regarding a finding by a judge in another case that the witness had guessed under oath was proper).

**H.** *The Jury Instructions on Burden of Proof.*

We have examined all of Vichare's remaining claims regarding the court's instructions on burden of proof and find them to be without merit.

**IV. CONCLUSION.**

The judgment of the trial court is affirmed.

---

**5.** Although *McKennon* involved a claim under the ADEA, its rationale is applicable to Title VII. *Castle v. Rubin,* 78 F.3d 654, 658 (D.C.Cir.1996) (per curiam); *Wallace v. Dunn Constr. Co.,* 62

F.3d 374, 378 (11th Cir.1995) (in banc); *Wehr v. Ryan's Family Steak Houses, Inc.,* 49 F.3d 1150, 1153 (6th Cir.1995); *see McKennon,* 513 U.S. at ——, 115 S.Ct. at 884.